## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | * | |
| | * | **Criminal No. 20-CR-00073-TFM** |
| v. | * | |
| | * | |
| TIA DEYON PUGH | * | |
| | * | |

### UNITED STATES' RESPONSE TO MOTION TO DISMISS

Comes now the United States of America, by and through Sean P. Costello, the United States Attorney for the Southern District of Alabama, and files this response to defendant Tia Pugh's motion to dismiss the indictment against her. [Doc. No. 52]  For the reasons stated herein, Pugh's motion should be denied.

### INTRODUCTION

On May 31, 2020, over one hundred individuals occupied the Interstate 10 on-ramp at Water Street in downtown Mobile.  At least some of these individuals did so with the intention of occupying the elevated portions of I-10 that go through downtown.  However, only one individual — defendant Tia Pugh — was charged with violating 18 U.S.C. § 231(a)(3).  This is because Pugh, through her violent actions, intentionally obstructed, interfered with, and impeded the Mobile Police Department's ability to quell the dangerous civil disorder occurring on the on-ramp.

Pugh was charged with violating Section 231(a)(3) because she chose to use a metal baseball bat she brought from home to shatter the window of a police vehicle with the intention that her attack would obstruct the officers on the scene who were in

1

the midst of dealing with a situation involving an immediate risk of injury and death. Contrary to her suggestions in her motion, Pugh was not charged with violating this statute because she was protesting law enforcement, nor was she charged for refusing to leave the on-ramp.   Furthermore, her claim that "[t]his prosecution arises from the demonstrations in support of racial justice" is highly misleading.  [Doc. No. 52, p. 10]

Pugh urges this Court to dismiss her indictment based on her claim that Section 231(a)(3) — the sole statute under which she is charged — is unconstitutional. Specifically, Pugh alleges that:  (1) Congress exceeded its authority under the Commerce Clause in enacting the statute; (2) the statute is unconstitutionally overbroad, in violation of the First Amendment; and (3) the statute is unconstitutionally vague, in violation of the Fifth Amendment.  *See* [Doc. No. 52, pp. 1–37]  In the alternative, Pugh argues the indictment itself is insufficient, and thus, dismissal is warranted.  *See* [*Id.*, pp. 37–39]

For the reasons presented by the United States in this response, Pugh has failed to carry her burden to demonstrate that Section 231(a)(3) is unconstitutional.   In addition, she has failed to demonstrate that her indictment is insufficient.  Accordingly, all of Pugh's arguments should be rejected by this Court, and this matter should proceed to trial in May 2021.

## BACKGROUND AND PROCEDURAL HISTORY

### I.   Underlying Facts[1]

On May 25, 2020, George Floyd died while in the custody of the Minneapolis Police Department.  The nature and circumstances of Mr. Floyd's arrest, subsequent death, and the actions of the Minneapolis Police Department came under intense public scrutiny.  Almost immediately following Mr. Floyd's death, public protests began in Minneapolis and expanded throughout the United States, including to Mobile.

On May 31, 2020, a planned protest related to the death of Mr. Floyd occurred in downtown Mobile.  Mobile Police Chief Lawrence Battiste, IV joined the protest leaders at the head of the march through downtown.

During the protest, some individuals left the planned protest route and gathered at the intersection of Government Street and Water Street, where an on-ramp leads to

---

[1]     The primary focus of Pugh's motion to dismiss is her constitutional challenges to 18 U.S.C. § 231(a)(3).   [Doc. No. 52, pp. 1–37]  To provide context for these constitutional claims, the United States proffers the facts in this section — most of which were set out in the criminal complaint affidavit, *see* [Doc. No. 1], and all of which the United States anticipates will be admitted through evidence and testimony during Pugh's trial.

Pugh also makes a brief alternative argument in which she challenges the sufficiency of her indictment.   [Doc. No. 52, pp. 37–39]  When evaluating this alternative argument, the Court must not consider these facts, nor those presented by Pugh in her motion to dismiss.  The sufficiency of an indictment must be evaluated on its face.  *United States v. Salman*, 378 F.3d 1266, 1268 (11th Cir. 2004).  To do otherwise would be akin to summary judgment in a criminal case and result in reversal.  *See id.* at 1267–68 (reversing a dismissal of an indictment where the district court looked beyond the indictment to rule on the merits of the charge, which "in effect granted summary judgment in favor of the defendant");  *United States v. Critzer*, 951 F.2d 306, 307 (11th Cir. 1992) (reversing the dismissal of an indictment where the district court "considered the facts proffered by the government" and "determined that, assuming the facts to be true, defendant's actions did not constitute a violation of federal law").

an elevated portion of Interstate 10[2] (hereinafter "I-10") in downtown Mobile.  To get to this on-ramp, these individuals pushed through metal police barricades, which had been set up at the intersection of Government Street and Royal Street.  These barricades were erected at that intersection before the protest to keep individuals from going near the I-10 ramps, which are only one block away.   Ultimately, more than 100 people — including Pugh — disregarded the police barricades and occupied the I-10 on-ramp at Water Street.



*News footage of individuals occupying the I-10 on-ramp.*  https://www.al.com/news/mobile/2020/06/mobile-demonstrator-now-facing-federal-charges.html  (last visited Mar. 25, 2021)

Occupying the I-10 on-ramp created an extremely dangerous situation, so Mobile Police Department (hereinafter "MPD") officers deployed a makeshift barrier on the

---

[2]      I-10 is an interstate highway connecting the east and west coasts of the United States.  Mobile is one of the many cities along this interstate.  I-10 is a major route used in the transportation of goods and commodities in interstate commerce.

On May 31, 2020, alone, ALDOT recorded 63,920 vehicles passing Counter ID: Mobile 57 (CCS # 744), which is located along the elevated portion of I-10 between the Virginia Street exits and the Wallace Tunnel.  *See* https://aldotgis.dot.state.al.us/TDMPublic/  (last visited Mar. 25, 2021).

on-ramp.  Their goal was to keep individuals from getting onto the elevated portions

of I-10, which would have created an imminent risk of injury or death to the individuals

and the motorists on I-10.  This makeshift barrier consisted of a row of marked MPD

vehicles, as well as numerous uniformed officers lined up across the on-ramp to prevent

individuals from getting onto the elevated portion of I-10 westbound.



*News footage of MPD's makeshift barrier on the I-10 on-ramp at Water Street.*  https://www.fox10tv.com/anti-riot-charge-against-mobile-protester/video_26ca67b1-b8b9-572c-bc60-dd10e8e8f61f.html  (last visited March 25, 2021).



*News footage of MPD's makeshift barrier on the I-10 on-ramp at Water Street.*  *See* BATES No. 689 (Fox10-Facebook video footage)

Due to the presence of Pugh and others on the I-10/Water Street on-ramp, the

Alabama Department of Transportation (hereinafter "ALDOT"), at MPD's direction,

was forced to close both the I-10 on-ramp at Water Street and Exit 26B eastbound for

approximately one hour.   These closures resulted in a significant delay for vehicles

traveling along I-10 through Mobile in both directions.  In addition, these closures forced commercial vehicles transporting hazardous material to take a 19.5 mile detour around the city, because eastbound Exit 26B, which is the permanent hazardous material route around the Wallace Tunnel, was closed.  These closures affected vehicles traveling in interstate commerce along I-10.

After learning that individuals were attempting to get on I-10, Chief Battiste left the planned protest then-occurring at Mardi Gras Park and proceeded to the on-ramp. There, Chief Battiste tried to calm the crowd and to get those on the on-ramp to return to Mardi Gras Park.  While Chief Battiste was speaking with individuals who identified themselves as the "leaders" of the on-ramp occupiers, various projectiles were thrown at the MPD officers and vehicles that were part of the makeshift barrier.  The series of pictures below, taken from AL.com video news footage, shows one instance of an individual on the on-ramp throwing a projectile at an MPD vehicle.[3]  The person wearing the red bandana around her neck and running past the person throwing the projectile is Pugh.

---

[3]      https://www.al.com/news/mobile/2020/06/mobile-demonstrator-now-facing-federal-charges.html (last visited Mar. 9, 2021).









Despite Chief Battiste's repeated attempts to get the crowd to disperse, the individuals refused to leave the on-ramp. Fearing the crowd would get past the makeshift barrier and onto the elevated section of I-10 — which Pugh has admitted was the intention of at least some of the occupiers, and which would have created an imminent risk of bodily injury and death — Chief Battiste decided that tear gas was necessary to end the dangerous civil disorder occurring on the on-ramp.[4]



*News footage of MPD's makeshift barrier on the I-10 on-ramp at Water Street. See* BATES No. 689 (Fox10-Facebook video footage)

---

[4]     It is important to note that MPD did not use tear gas during any of the protests related to the death of Mr. Floyd. The lawful protests that occurred that day in Mobile and the civil disorder that occurred on the I-10 on-ramp must not be conflated into a single event.

Shortly after tear gas was deployed, Pugh — wearing a red bandana around her neck — rushed forward, turned toward the crowd yelling, and then destroyed the window of an MPD vehicle with a metal baseball bat.  This entire event was captured on video by CBS affiliate WKRG and others.[5]  Still shots from video footage clearly show Pugh's actions:





---

[5]    *See*    https://www.wkrg.com/mobile-county/woman-wanted-for-smashing-mpd-cruiser-window/ (last visited Mar. 25, 2021).













Thankfully, the MPD officer who was stepping out of the vehicle at the time Pugh smashed the window was not injured.   However, Pugh's deliberate attack obstructed, impeded, and interfered with MPD's efforts to maintain a barrier line to keep those engaged in the civil disorder on the on-ramp from getting onto the elevated section of I-10.   Once Pugh destroyed the window, MPD officers who had been part of the barrier line were forced to surround the disabled vehicle, because it contained firearms and live ammunition.   There was also significant concern that Pugh's attack would fuel further violence against MPD officers or more destruction of property.

After deliberately shattering the window with a metal bat, Pugh ran back into the crowd occupying the on-ramp and then fled the scene.   News coverage of the incident showed numerous videos and pictures of Pugh, and the public was asked to help identify the then-unidentified rioter.   *See, e.g.,* "Woman Wanted for Smashing MPD Cruiser Window during Sunday Protest," WKRG, CBS News 5, Jun. 1, 2020, *available at* https://www.wkrg.com/mobile-county/woman-wanted-for-smashing-mpd-cruiser-window/ (last visited Mar. 25, 2021).   Two days after her attack, MPD positively identified Pugh as the rioter seen in the video destroying the MPD vehicle window.

On June 2, 2020, MPD officers located Pugh and her fiancée William Baucom living in an apartment complex in Mobile.   Officers made contact with Baucom who told them that Pugh no longer lived there, but rather, had moved to Foley, Alabama. Believing that Baucom was lying, officers stayed in the vicinity of the apartment complex.   A short time later, as Baucom was driving out of the front of the apartment

complex, officers observed Pugh running out the back.  After a short foot pursuit, Pugh surrendered.  She was arrested on state charges of Inciting a Riot and Criminal Mischief, Third Degree, and was transported to the MPD Headquarters.

Following her arrest, Pugh was advised of, and subsequently waived, her *Miranda* rights.  During her recorded interview, Pugh admitted that she formed "*a game plan*"[6] with Baucom before going downtown for the planned protest.   Specifically, if they were separated or "*if things turned into a riot*," Pugh and Baucom would meet up at Mardi Gras Park.  Such a plan was necessary, because, as Pugh explained, they turned off their phones when they arrived downtown.  Pugh also admitted that she brought the metal bat from home, claiming it was "*for protection*."

When asked to explain what occurred on the I-10 on-ramp, Pugh claimed, "*We were tear-gassed.  It was an attack on a peaceful protest.*"   She went on to say:  "*It's happened in 30 plus states, a majority of America.  Everyone has gotten on the Interstate.  It's no different here. We were attacked first, and I was getting my people out of there.*"[7]   In response to a question about whether she thought "*it was rightful for you to be up on the Interstate,*" Pugh explained, "*Yeah.  They've done it in 30 plus others states.  We did not instigate.  We did not escalate.*" However, Pugh then acknowledged, "*I escalated, personally on my own.  And no one followed behind me, which they were supposed to do.*"

---

[6]      Italicized text are direct quotes from the recorded interview.

[7]      During her interview, Pugh used the terms "*my people*" and "*my group*" interchangeably.  When asked to identify her group, Pugh explained it was "*Black Lives Matter.*"   Pugh also stated that it was more than just her group occupying the on-ramp that day.

Regarding her actions, Pugh claimed that she believed "*my people*" were blocked in by police, so "*I drew attention to myself to get them out of there.*" When asked to clarify what she meant by drawing attention to herself, Pugh specified: "*I swung a bat at* [*the police car*] *and it broke the window.*"

Later in the interview, Pugh reiterated her claim that "*we were trapped. We felt like we couldn't go anywhere except the route* [*the police*] *said we could go . . . . We don't have to listen to the government on how to protest against the government.*" She also explained that the point of destroying the window was so everyone in her group could "*run away from me. I stand and stay and I get that charge. I get it, whatever may come, and the repercussions of that.*" However, Pugh admitted that she did not stand there and let herself get arrested. Rather, she ran away. Finally, towards the end of the interview, Pugh acknowledged: "*I understand the full weight of it. I understand what I did . . . . I know what the fuck I did and I know why I did it.*"

## II.   Procedural History

On June 5, 2020, Pugh was charged via criminal complaint with violating 18 U.S.C. § 231(a)(3). [Doc. No. 1] Three weeks later, a federal grand jury in the Southern District of Alabama indicted Pugh on this same charge. [Doc. No. 16]

On January 26, 2021, Pugh filed a motion to dismiss her indictment on the grounds that Section 231(a)(3) is unconstitutional, or in the alternative, because her indictment is deficient. [Doc. Nos. 52, 54] The United States was ordered to respond by March 26, 2021. [Doc. No. 60]

14

## ANALYSIS

## CONSTITUTIONAL CHALLENGES TO SECTION 231(A)(3)

As part of The Civil Rights Act of 1968, Congress established that it is a federal crime for a person to commit, or attempt to commit, any act "to obstruct, impede, or interfere with any . . . law enforcement officer lawfully engaged in the lawful performance of his official duties incident to and during the commission of a civil disorder which in any way or degree obstructs, delays, or adversely affects commerce or the movement of any article or commodity in commerce . . . ." 18 U.S.C. § 231(a)(3). The term "civil disorder" is defined in this statute to mean "any public disturbance involving acts of violence by assemblages of three or more persons, which causes an immediate danger of or results in damage or injury to the property or person of any other individual." 18 U.S.C. § 232(2). The term "law enforcement" includes state and local officers. 18 U.S.C. § 232(7).

Pugh challenges the constitutionality of Section 231(a)(3) by claiming: (1) Congress exceeded its authority under the Commerce Clause when enacting the statute; (2) the statute is overbroad, in violation of the First Amendment, and (3) the statute is unconstitutionally vague, in violation of the Fifth Amendment.  The merits of these challenges to the constitutionality of Section 231(a)(3) are addressed below.

For the reasons stated herein, this Court should reject all of Pugh's constitutional claims.

I.     **Threshold Matters that Must be Addressed**

   A.     **Pugh's Reliance on Legislative History is Misplaced.**

Pugh alleges that Section 231(a)(3) was enacted "to counter the protections of the Civil Rights Act and to silence civil rights leaders in 1968." [Doc. No. 52, p. 1] She is wrong.

At the outset, it is well-established that courts must not refer to the legislative history of a statute unless the statutory language is "inescapably ambiguous." *See United States v. Williams*, 790 F.3d 1240, 1245 (11th Cir. 2015). *See also CBS Broad., Inc. v. Echostar Commc'ns Corp.*, 265 F.3d 1193, 1212 (11th Cir. 2001) ("This Circuit's decisions . . . mandat[e] that ambiguity in statutory language be shown *before* a court delves into legislative history.") (added emphasis). Indeed, the Supreme Court has "explained many times" that "when the meaning of the statute's terms is plain, our job is at an end." *Bostick v. Clayton County*, 140 S. Ct. 1731, 1749 (2020). Pugh has not shown that the statute is inescapably ambiguous, so Section 231(a)(3)'s legislative history is irrelevant.

Nevertheless, it bears note that Pugh's claims about the legislative history are cherry-picked misrepresentations. Pugh's exclusive focus is on Senator Russell B. Long (D-Louisiana). As Pugh correctly observes, Senator Long has made highly offensive remarks. However, most of the statements highlighted by Pugh relate not to Section 231(a)(3), but rather to earlier proposed legislation. *See* [Doc. No. 52, p. 4] Furthermore, Pugh fails to address the fact that Senator Long ultimately voted *against* H.R. 2516, which contained Section 231.   See 114 CONG. REC. 5992 (1968).

16

A broader look at this statute's legislative history paints a very different picture than the one Pugh presents to this Court.   What eventually became Section 231(a)(3) was enacted as part of bipartisan civil rights legislation following a series of civil disorders in the 1960s.  The legislation was designed to address, among other things, (1) racial and religious discrimination in connection with federally protected activities; (2) the rights of Native Americans; and (3) racial discrimination in housing.  PUB. L. NO. 90-284, 82 STAT. 73-92 (1968).  Far from being enacted to counter civil rights legislation, this legislation was intended to counter both the evils of racial discrimination and civil unrest.  See 114 CONG. REC. 9608–09 (1968).  As Representative Clarence "Bud" Brown (R-Ohio) succinctly stated:

> We need legislation to prevent inference with those pursuing their own civil rights or attempting to educate others about their rights.  But we also need legislation to prevent inciting of violence in the name of civil rights or under whatever pretext. . . .  For all of these reasons — but with emphasis on the continuing need to do justice, to discourage racial discrimination, to bring new hope to all our people — I urge colleagues to approve the resolution and to pass the bill.

114 CONG. REC. 9608–09 (1968).

Pugh's brief does not accurately portray the debate over Section 231 in the Senate either.  Pugh fails to mention that after Senator Long stated that Section 231 "would be used to put down uprisings of the Ku Klux Klan, just as it would be used to put down an uprising caused by Rap Brown[8]," Senator Robert F. Kennedy (D-New York)

---

[8]      H. Rap Brown was a controversial African American figure who, at times, supported the use of violence.  Brown, who later changed his name to Jamil Abdulla Al-Amin, is now a convicted felon.  *See, e.g., Al-Amin v. Shartle*, 2017 WL 6596602 (N.D. Ga. 2017); *United States v. Brown*, 539 F.2d 467 (5th Cir. 1976).

responded, "I shall support the Senator from Louisiana.  I believe this would be very important legislation.  It would be a historic day in the Senate of the United States, and I congratulate the Senator from Louisiana." 114 CONG. REC. 5541 (1968) (statements of Sens. Long and Kennedy).  The Senate passed this legislation, in bipartisan fashion, with votes from high-profile civil rights supporters, including Senator Kennedy and Senator Everett Dirksen (R–Illinois), the later of whom was instrumental in the passage of the Civil Rights Act of 1964.  114 CONG. REC. 5592, 5598.

Pugh has not, as the Eleventh Circuit requires, demonstrated that the language in Section 231(a)(3) is "inescapably ambiguous." *Williams*, 790 F.3d at 1245; *CBS Broad., Inc.*, 265 F.3d at 1212.  Thus, her reliance on legislative history is entirely misplaced.  Furthermore, even if she had made the requisite showing of inescapable ambiguity, her focus on just the statements of Senator Long, and silence on the rest of the statute's legislative history, is not the proper method of analysis.  For these reasons, the biased version of legislative history put forth by Pugh should not be used as part of this Court's constitutional analysis of Section 231(a)(3).

**B.    To the Degree Pugh is Making a Selective Prosecution Argument, Such an Argument Should be Rejected.**

At various points throughout her motion, Pugh alleges that Section 231(a)(3) is "seldom-invoked."  This claim is misleading.

Currently, Section 231(a)(3) is being used to prosecute many of the insurrectionists who attacked the U.S. Capitol on January 6, 2021, as well as those who participated in the civil unrest that occurred during the summer of 2020.  As of the date

of this response, the United States has charged over 80 people with violating Section 231(a)(3) in connection with these events.   Thus, while this statute may not have been frequently used in the past,[9] it is currently being used to prosecute the criminal conduct engaged in by Pugh and others.

It is unclear whether Pugh lobs this allegation to garner sympathy — or generate outrage, or whether Pugh is arguing that she is being subjected to selective prosecution. If Pugh is doing the latter, her claim should be rejected.

To succeed on a selective prosecution claim, Pugh would have to carry a "demanding burden" to "present clear evidence" that "the federal prosecutorial policy had a discriminatory effect and that it was motivated by a discriminatory purpose." *United States v. Cannon*, 987 F.3d 924, 937 (11th Cir. 2021).   Specifically, Pugh would carry the burden to demonstrate that (1) "similarly situated individuals were not prosecuted," and (2) "the decisionmaker selected or reaffirmed a particular course of action at least in part because of, not merely in spite of, its adverse effects upon an identifiable group." *United States v. Brantley*, 803 F.3d 1265, 1271 (11th Cir. 2015).   Pugh has not done so in this motion, nor could she prevail if she had.

Accordingly, to the degree that Pugh is attempting to allege that she is being selectively prosecuted, her claim should be rejected.

---

[9]   Since its enactment in April 1968, this country has experienced relatively few instances of civil disorder the likes of which were witnessed during the summer of 2020 and at the U.S. Capitol on January 6, 2021.  Thus, it should come as no surprise that Section 231(a)(3) has been infrequently charged in the past.

## III.   Section 231(a)(3) Does Not Exceed Congress's Authority Under the Commerce Clause.

Pugh first challenges the constitutionality of Section 231(a)(3) by arguing that the statute exceeds Congress's authority under the Commerce Clause, because it "does not regulate activity that substantially affects interstate commerce."  [Doc. No. 52, p. 14] However, Pugh's interpretation of Section 231(a)(3) in light of the Supreme Court's reasoning in *Lopez*[10] and *Morrison*[11] is flawed and should be rejected.

### A.   Congress's Authority Under the Commerce Clause

The Commerce Clause authorizes Congress to "regulate Commerce with foreign Nations, and among the several States, and with the Indian Tribes."  U.S. CONST. ART. I, § 8, Cl. 3.  "[I]t is now well established that Congress has broad authority under th[at] Clause."  *National Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 549 (2012) (opinion of Roberts, C.J.).  Among other things, "the Commerce Clause has . . . long been interpreted" to grant Congress authority "extend[ing] beyond activities actually in interstate commerce to reach other activities that, while wholly local in nature, nevertheless substantially affect interstate commerce."  *McLain v. Real Estate Bd. of New Orleans, Inc.*, 444 U.S. 232, 242 (1980).  Accordingly, the Supreme Court's jurisprudence establishes that, "under its commerce power," Congress may regulate the "channels of interstate commerce," "instrumentalities of interstate commerce" and "persons or

---

[10]    *United States v. Lopez*, 514 U.S. 549 (1995).

[11]    *United States v. Morrison*, 529 U.S. 598 (2000).

things in interstate commerce," and "those activities that substantially affect interstate commerce." *Taylor v. United States*, 136 S. Ct. 2074, 2079 (2016) (quoting *United States v. Lopez*, 514 U.S. 549, 558–559 (1995)); *accord United States v. Morrison*, 529 U.S. 598, 608–609 (2000); *see also, e.g., Gonzales v. Raich*, 545 U.S. 1, 16–17 (2005); *Perez v. United States*, 402 U.S. 146, 150 (1971).

### C.   Section 231(a)(3) is a Proper Exercise of Congress's Commerce Clause Authority.

Section 231(a)(3) is one of many statutory provisions enacted by Congress to protect the flow of interstate commerce from unwarranted interference. Where a civil disorder is "obstruct[ing], delay[ing], or adversely affect[ing]" interstate commerce or the movement of an item in interstate commerce,[12] Congress sought to provide law enforcement and firefighters with the ability to contain and ultimately end the crisis without obstruction from persons like Pugh who would impede them. In doing so, Congress was acting to protect the channels of interstate commerce — including I-10 and its ingress and egress — to protect the flow of things in interstate commerce, and to regulate activity that substantially affects interstate commerce. Section 231(a)(3) thus fits comfortably within all three of the areas of Congressional power identified by the Supreme Court in *Lopez*, *Morrison*, and *Taylor*.

---

[12]   The term "commerce" in Section 231(a)(3) is defined to mean "commerce (A) between any State or the District of Columbia and any place outside thereof; (B) between points within any State or the District of Columbia, but through any place outside thereof; or (C) wholly within the District of Columbia." 18 U.S.C. § 232(2). The first two prongs of this definition define commerce as interstate commerce and implement Congress' Commerce Clause power. The third prong, which relies on Congress' plenary power to legislate over the seat of government, is not at issue in this case.

### (1)   Section 231(a)(3) Contains a Jurisdictional Element, Which Materially Distinguishes it from Statutes Struck Down in *Lopez* and *Morrison*.

Pugh's reliance on *Lopez* and *Morrison* is misplaced.  Those decisions struck down statutory provisions that regulated non-economic activity unconnected to interstate commerce and which, crucially, did not contain a jurisdictional element related to interstate commerce.

It has long been understood that Congress may regulate even non-economic intrastate activity so long as there is a jurisdictional provision that ensures the statute applies only where the regulated activity affects (or would affect) interstate commerce. *Compare United States v. Bass*, 404 U.S. 336 (1971) (applying a statute that regulated "receiv[ing], possess[ing], or transport[ing] in commerce or affecting commerce . . . any firearm" by a felon), *with*, *Lopez*, 514 U.S. at 562 (striking down statute where, "[u]nlike the statute in *Bass*, [the Gun-Free School Zones Act had] no express jurisdictional element which might limit its reach to a discrete set of firearm possessions that additionally have an explicit connection with or effect on interstate commerce"), *and Morrison*, 529 U.S. at 613 (holding that the civil remedies in 42 U.S.C. § 13981 were beyond Congress's power under the Commerce Clause where, "[l]ike the Gun–Free School Zones Act at issue in *Lopez*, § 13981 contain[ed] no jurisdictional element establishing that the federal cause of action is in pursuance of Congress'[s] power to regulate interstate commerce" (first and last alteration in original)).

The "jurisdictional element of the statute . . . immunizes [it] from [a] facial constitutional attack." *United States v. Scott*, 263 F.3d 1270, 1273 (11th Cir. 2001). Indeed, as multiple circuits have recognized, the very constitutional defect identified in *Lopez* was cured by the addition of a jurisdictional element. *See, e.g., United States v. Thomas*, 810 F. App'x 789, 796 (11th Cir. 2020) (noting that "Congress amended § 922(q) to include an explicit 'affecting interstate commerce' element to cure the deficiencies identified in *Lopez*"); *United States v. Dorsey*, 418 F.3d 1038, 1046 (9th Cir. 2005) ("This jurisdictional element saves § 922(q) from the infirmity that defeated it in *Lopez*"), *abrogated on other grounds*, *Arizona v. Gant* 556 U.S. 332 (2009). Moreover, as the Fourth Circuit has recognized, Supreme Court precedent holds that "Congress may regulate violent conduct interfering with interstate commerce even when the conduct itself has a 'minimal' effect on such commerce." *United States v. Hill*, 927 F.3d 188, 199 (4th Cir. 2019) (quoting *Taylor*, 136 S. Ct. at 2079).

To be sure, a constitutionally adequate jurisdictional element must be "meaningful" and not merely a "pretextual incantation evoking the phantasm of commerce." *United States v. Maxwell*, 446 F.3d 1210, 1218 (11th Cir. 2006). Section 231(a)(3)'s jurisdictional hook easily meets this test. There are innumerable disturbances of the peace, but Section 231(a)(3) applies only to the subset of civil disturbances that affect interstate commerce, such as those that cut off thorough-fares or prevent use of significant commercial or government buildings for an extended period of time. And an individual can be charged under Section 231(a)(3) only if he or

she impedes or attempts to impede police or firefighters — the very public safety professionals charged with containing, mitigating, and ultimately ending the public disturbance, and thereby prevents those law enforcement officers from restoring the channels and instrumentalities of interstate commerce. Thus, the statute only applies in relation to civil disturbances that adversely affect interstate commerce, and only with regard to a specific class of activities that will tend to prolong the obstruction of interstate commerce.

The jurisdictional element that the Eleventh Circuit, in *Scott*, found sufficient to make 18 U.S.C. § 922(g)(1) constitutional included that the firearm or ammunition at issue "ha[ve] been shipped or transported in interstate or foreign commerce." 263 F.3d at 1272. Section 231(a)(3)'s jurisdictional element has a much tighter temporal limitation. While, under Section 231(a), a defendant's conduct must take place contemporaneous with the civil disorder that disrupted commerce, under the gun statute the gun may have moved in interstate commerce at some point in the distant past. Section 231(a) also has a more proximate relationship to Congress' goal of protecting interstate commerce. Section 231(a) aims directly to end an impediment to interstate commerce, while the gun statute regulates commerce indirectly by prohibiting the intrastate use of an item that previously moved in interstate commerce. Thus, *Scott's* holding requires a similar holding here.[13]

---

[13]       Moreover, even if there were some hypothetical application of Section 231(a)(3) that reached beyond Congress' constitutional power, that would not facially invalidate the statute. *See, e.g., Hill v. Colorado*, 530 U.S. 703, 733 (2000).

**(2)    The is No Requirement that the Jurisdictional Element in Section 231(a)(3) Must Have a Substantial Effect on Commerce.**

In addition, Pugh's argument that the jurisdictional element is required to involve a *substantial* effect on commerce is wrong.  Jurisdictional elements generally condition the application of a statute on an effect on interstate commerce in the particular case. For example, similar to the Section 922(g) element discussed above, the Hobbs Act likewise applies to one who "in any way or degree obstructs, delays, or affects commerce or the movement of any article or commodity in commerce" by robbery or extortion. 18 U.S.C. § 1951.  Section 231(a)(3)'s jurisdictional element is no broader than this. *See Taylor*, 136 S. Ct. at 2079 (discussing the breadth of the Hobbs Act jurisdictional element); *see also United States v. Juvenile Male*, 118 F.3d 1344, 1347–1349 (9th Cir. 1997) (holding that RICO's jurisdictional nexus requirement can, consistent with *Lopez*, be satisfied by showing a *de minimis* effect on commerce in the individual case).

The "substantially affects" test that Pugh advocates applies where Congress seeks to regulate *an entire class of activities* based on the aggregate effect of that entire class rather than the specific effect of the activity of a particular defendant.  Thus, in *Raich*, the Supreme Court found the Controlled Substances Act's categorical ban on intrastate manufacture and possession of marijuana was constitutional because Congress had a rational basis for concluding that the "class of activities" *in the aggregate* substantially affected commerce, and the Act could be applied constitutionally to Angel Raich's intrastate growing of marijuana for personal medicinal purposes even though her

activity did not substantially affect interstate commerce. 545 U.S. at 15–22. Thus, Pugh is incorrect when she argues that the United States must show that *her* activity *substantially* affected commerce or that a jurisdictional element must include a "substantially affects" requirement.

### (3) There is No Requirement that Pugh's Personal Conduct Must Affect Interstate Commerce.

Pugh is also wrong in arguing that Section 231(a)(3)'s jurisdictional element is insufficient. This is because her *personal conduct* need not affect commerce so long as the underlying civil disorder affected commerce. Similarly, other statutes do not require proof that a defendant personally affected commerce, where a defendant's conduct relates to an underlying activity that had the required effect. *See, e.g., Juvenile Male*, 118 F.3d at 1347–49 (upholding RICO's jurisdictional nexus requirement where it is the racketeering enterprise, not the defendant himself, that must affect commerce); *United States v. Ramos*, 2016 WL 8222072, at *5 (N.D. Ga. Dec. 19, 2016) (same).

Pugh's attempt to distinguish the Hobbs Act on the ground that the Hobbs Act is "directly aimed at economic activities" likewise fails. Both the Hobbs Act and Section 231(a)(3) aim to protect interstate commerce from illegal acts that impede commerce. In any event, courts have upheld RICO's similar jurisdictional nexus requirement, and RICO applies to non-economic enterprises. *See National Organization for Women, Inc. v. Scheidler*, 510 U.S. 249, 256–58 (1994) (holding that RICO does not require that the enterprise or predicate acts be accompanied by an economic motive). Like a RICO

enterprise, a civil disorder "surely can have a detrimental influence on interstate or foreign commerce without having its own profit-seeking motives." *Id.* at 258.

> **(4)    Pugh Has Failed to Demonstrate that Section 231(a)(3) is an Unauthorized Exercise of Congressional Authority Under the Commerce Clause.**

Since Section 231(a)(3) applies only where a defendant seeks to impede the work of police or firefighters incident to a civil disturbance that affects interstate commerce, it is within Congress' Commerce Clause authority to regulate such conduct. This statue easily passes constitutional muster under the most recent Court precedent. *Taylor,* 136 S.Ct. at 2079-81.   It should be noted, moreover, that even under the most restrictive theory of Congress' Commerce Clause power advanced by Justice Thomas, a law protecting interstate commerce from interference, as Section 231(a)(3) does, is a permissible use of Congressional power.   Such a law "bears an obvious, simple, and direct relation to regulating interstate commerce: it allows commerce to flow between States unobstructed." *Taylor*, 136 S. Ct. at 2085 (Thomas, J., dissenting) (quotation marks omitted); *see also id.* ("Congress' power '[t]o regulate Commerce among the several States,' Art. I, § 8, cl. 3, would lack force or practical effect if Congress lacked the authority to enact criminal laws prohibiting interference with interstate commerce or the movement of articles or goods in interstate commerce."); *cf.* Def's Ex. B at 2 (statement of Sen. Long that "if the riot impedes interstate commerce, Congress has a duty to protect the movement of commerce").

The jurisdictional element in Section 231(a)(3) ensures that the statute applies only where the civil disturbance that a defendant sought to prolong, by obstructing the public safety personnel whose duty is to mitigate, contain, and end the disturbance, is one that adversely affected interstate commerce.   Such a jurisdictional provision renders the statute constitutional.  *See Scott*, 263 F.3d at 1273.  Moreover, under any understanding of the Commerce Clause, a statute that protects the flow of commerce between the states from obstructions, as Section 231(a)(3) does, is a permissible use of Congress' Commerce Clause powers.

For all of these reasons, this Court should reject Pugh's claim that Section 231(a)(3) is unconstitutional because it exceeds Congress' authority under the Commerce Clause.

## IV.   Section 231(a)(3) Is Not an Overbroad Content-Based Restriction on Expression in Violation of the First Amendment.

In her next challenge to the constitutionality of Section 231(a)(3), Pugh alleges the statute is facially overbroad, in violation of the First Amendment.   [Doc No. 52, pp. 21–32]  Specifically, Pugh claims Section 231(a)(3) violates the First Amendment (1) because it "is a substantially overbroad regulation of protected expression," and (2) because it "was enacted for the express legislative purpose of suppressing the content of messages favoring civil rights advocacy."   [Doc. No. 52, p. 21]

For the reasons set out below, Pugh's arguments are without merit.   Section 231(a)(3) does not violate the First Amendment, and her arguments should be rejected.

### A.      Pugh has Failed to Bear her Burden to Establish that Section 231(a)(3) is Unconstitutional Due to Overbreadth.

#### (1)      Overview of the Overbreadth Doctrine

A claim of overbreadth is a facial challenge to the constitutionality of a statute. *See Brockett v. Spokane Arcades, Inc.*, 472 U.S. 491, 503 (1985). As the Supreme Court has explained, the overbreadth doctrine "prohibits the Government from banning protected speech if a substantial amount of protected speech is prohibited or chilled in the process." *Ashcroft v. Free Speech Coalition*, 535 U.S. 234, 255 (2002). Accordingly, a statute that "prohibits a substantial amount of protected speech" is "facially invalid," and therefore, unconstitutional. *United States v. Williams*, 553 U.S. 285, 293 (2008); *see also Grayned v. City of Rockford*, 408 U.S. 104, 114 (1972).

Facial overbreadth challenges can also be raised when the statute primarily targets *conduct* as opposed to speech. However, defendants who raise such challenges — as is the case here — face a steep uphill climb. *See Virginia v. Hicks*, 539 U.S. 113, 119 (2003) (noting the "substantial social cost created by the overbreadth doctrine when it blocks application of a law to . . . constitutionally unprotected conduct").

#### (2)      Pugh Has Standing to Raise an Overbreadth Challenge, but Bears a Substantial Burden to Prove Her Claim.

It is without question that Pugh's *conduct* — violently attacking a police vehicle with a metal baseball bat — *is neither* protected speech *nor* protected conduct. However, despite Pugh's conduct being unprotected, she can still raise a facial challenge to the constitutionality of the statute. *See Broadrick v. Oklahoma*, 413 U.S. 601, 612 (1973) (a

defendant whose conduct is not constitutionally protected can raise an overbreadth challenge on the grounds "that the statute's very existence may cause others not before the court to refrain from constitutionally protected speech or protection"); *United States v. DiPietro*, 615 F.3d 1369, 1372 (11th Cir. 2010) (noting that a defendant "to whom the law may be constitutionally applied may assert an overbreadth challenge to a law on the ground that it violates the First Amendment rights of others").

It is well established that the challenging party bears the burden to prove a statute is unconstitutional due to overbreadth. *See, e.g., Hicks*, 539 U.S. at 122 (2003); *United States v. Dean*, 635 F.3d 1200, 1204 (11th Cir. 2011). Thus, to prevail, Pugh must demonstrate that Section 231(a)(3) "criminalizes a substantial amount of protected expressive activity." *Dean*, 635 F.3d at 1205 (quoting *Williams*, 553 U.S. at 297). Both the Supreme Court and the Eleventh Circuit recognize that this is a very high barrier to overcome:

> The Supreme Court describes facial invalidation for overbreadth as strong medicine that has been employed by the Court sparingly and only as a last resort. The Court has vigorously enforced the requirement that a statute's overbreadth be substantial, not only in an absolute sense, but also relative to the statute's plainly legitimate sweep, before it may be invalidated.

*Dean*, 635 F.3d at 1204 (citing *Williams*, 553 U.S. at 292; *Broadrick*, 423 U.S. at 613 (1973)); *City of Houston v. Hill*, 482 U.S. 451, 458 (1987) (facial invalidity is limited to those cases involving "substantial overbreadth"). Furthermore, the "mere fact that one can conceive of some impermissible applications of a statute is not sufficient to render it susceptible to an overbreadth challenge." *Williams*, 553 U.S. at 303 (quoting *Members*

*of City Council v. Taxpayers for Vincent*, 466 U.S. 798, 800 (1984)). Rather, if the statute is "readily susceptible" to a narrowing construction that would make it constitutional, it must be upheld. *Virginia v. Am. Booksellers Ass'n.*, 484 U.S. 383, 397 (1988); *accord Broadrick*, 413 U.S. at 613.

To satisfy her burden to prove that Section 231(a)(3) is unconstitutional due to overbreadth, Pugh must (1) identify protected activities that would be targeted by the statute, *and* (2) demonstrate that such protected activities are "substantial, not only in an absolute sense, but also relative to the statute's plainly legitimate sweep." *Dean*, 635 F.3d at 1206. Put another way, Pugh must show a "realistic danger that the statute itself will significantly compromise recognized First Amendment protections of parties not before the Court." *Taxpayers for Vincent*, 466 U.S. at 801.

**(2)     Analysis of Pugh's Overbreadth Challenge to Section 231(a)(3)**

As will be discussed in this section, Section 231(a)(3) primarily prohibits a narrow type of *conduct*, not speech. Section 231(a)(3) does not criminalize verbally criticizing police, the government, or any other protected speech. Pugh has failed to establish otherwise. It is her burden to prove her claim, and she has failed to do so.

**(a)     Analyzing Section 231(a)(3).**

The first step in evaluating Pugh's overbreadth claim is to determine what Section 231(a)(3) actually criminalizes. *Williams*, 553 U.S. at 293 (noting that "it is impossible to determine whether a statute reaches too far without first knowing what the statute covers"). Pugh claims that the "broad language of the statute and its purpose

to target certain speech and political movements for civil rights invalidates the statute under the First Amendment." [Doc. No. 52, p. 25]   She is wrong.   Section 231(a)(3) does not "target" protected speech or expression, but rather criminalizes intentional, unprotected conduct.

### (i)      Section 231(a)(3) Targets Unprotected Conduct.

Section 231(a)(3) criminalizes "any act to obstruct, impede, or interfere with any fireman or law enforcement officer" who is engaged in the lawful performance of his official duties during a civil disorder that may obstruct, delay, or adversely affect commerce or commodity in commerce.    18 U.S.C. § 231(a)(3).   By its plain language, the statute's focus is on *conduct*, not speech.   The statute's reach is limited because the conduct is only criminalized under Section 231(a)(3) if it occurs during a civil disorder affecting interstate commerce.

Importantly, Section 231(a)(3) does not prohibit a person's *presence* at a civil disorder, nor a person's *participation* in a civil disorder.[14]     Rather, it prohibits intentionally obstructive acts committed during the course of a civil disorder.   As such, Section 231(a)(3) is not unique.   There are numerous federal and state statutes that criminalize obstructing the government's efforts to enforce the law and maintain public order.   *See, e.g.,* 18 U.S.C. § 2237 (making it unlawful to "oppose, prevent, impede,

---

[14]      As noted in the Background Section, over 100 individuals were present during, and/or participated in, civil disorder on the I-10 on-ramp.  However, only Pugh was charged with violating Section 231(a)(3).

intimate or interfere with" a maritime investigation); 26 U.S.C. § 7212(a) (prohibiting

obstructing or impeding the administration of tax laws); *see also United States v. Jeter*, 775

F.2d 670, 679 (6th Cir. 1985) (holding that the federal obstruction of justice statute, 18

U.S.C. § 1503, is neither overbroad nor vague); *United States v. Brice*, 926 F.2d 925, 930–

31 (9th Cir. 1991) (rejecting overbreadth and vagueness challenges to 41 C.F.R. § 101–

20.305, which prohibits impeding or disrupting government duties).

### (ii) Section 231(a)(3) Scienter Requirement Limits the Statute's Scope to Intentional Conduct.

Second, the *mens rea* element in Section 231(a)(3) fatally undercuts Pugh's

arguments.  The statue is properly interpreted as containing a *mens rea* requirement.

Contrary to Pugh's suggestion that individuals could be charged under this statute or

merely engaging in protected speech or expression, the statute only criminalizes those

acts which are done with the intent to obstruct, interfere, or impede.  Notably, two

circuits have already endorsed such a construction of this statute.   As the Seventh

Circuit has noted:

> It is true that Section 231(a)(3) does not specifically refer to intent, but it
> only applies to a person who "commits or attempts to commit any act to
> obstruct, impede, or interfere" with firemen or law enforcement.  Under
> such phraseology, it will not be presumed that Congress intended strict
> liability for inadvertent or accidental occurrences where, as here, the crime
> is grounded on the common law.

*Nat. Mobilization Comm. to End War in Viet Nam v. Foran*, 411 F.2d 934, 937 (7th Cir.

1969).  Two years later, the Eighth Circuit agreed that "§ 231(a)(3) must be construed

to require intent." *Mechanic*, 454 F.2d at 854.

The Seventh Circuit's reasoning in in *National Mobilization Committee* is highly persuasive because the statutory language also supports a finding that Congress intended a *mens rea* requirement in Section 231(a)(3).   The plain language of the statute requires proof that the "act" was done "to obstruct, impede, or interfere with a police officer or firefighter."   The natural reading of this is that the United States must prove the defendant's intent in carrying out the "act" was "to obstruct, impede, or interfere with."   This Court, like the Eighth Circuit in *Mechanic*, should adopt the Seventh Circuit's reasoning and construe Section 231(a)(3) as containing an intent element.

However, even where statutes do not expressly contain a scienter requirement, courts "generally interpret [ ] criminal statutes to include broadly applicable scienter requirements, even when the statute by its terms does not contain them." *Elonis v. United States*, 135 S. Ct. 2001, 2009 (2015) (quoting *United States v. X-Citement Video, Inc.*, 531 U.S. 64, 70 (1994)).

The importance of the scienter requirement in an overbreadth analysis is on display in the Supreme Court's 2008 opinion in *Williams.*   553 U.S. 285.   In that case, the Supreme Court rejected an overbreadth challenge to a statute prohibiting, among other things, presenting and promoting child pornography.   *Id.* at 294–97.   The Supreme Court acknowledged that the words "present" and "promote" in the statue could, "in isolation," be viewed as targeting mere advocacy for child pornography.   *Id.* However, the Supreme Court rejected that construction espoused by the defendant based on textual indicators, including the statute's scienter requirement.   *Id.*; *see also id.*

at 307 (Stevens, J., concurring) (observing that the Supreme Court's construction would be "compelled by the principle that 'every reasonable construction must be resorted to, in order to save a statute from unconstitutionality'").

The intent element in Section 231(a)(3) is a powerful limitation on criminal liability. The parade of horribles described in Pugh's motion is illusory.

### (iii) Even if Section 231(a)(3) Could Incidentally Criminalize Some Speech or Expression, This Does Not Render the Statute Unconstitutional.

Based on the plain reading of the statute and its scienter requirement, it is evident that Section 231(a)(3) applies to conduct, not protected speech or expression. *See Mechanic*, 454 F.2d at 853 (explaining that Section 231(a)(3) "does not purport to reach speech of any kind. It reaches only acts to impede, obstruct, or interfere with police officer and firemen").

However, even if applying Section 231(a)(3) to particular forms of conduct that *might incidentally* implicate speech, "it has never been deemed an abridgment of freedom of speech or press to make a course of conduct illegal merely because the conduct was in part initiated, evidenced, or carried out by means of language, either spoken, written, or printed." *Giboney v. Empire Storage & Ice Co.*, 336 U.S. 490, 502 (1949). The Ninth Circuit recently affirmed this principle when it recognized that the anti-rioting statute, 18 U.S.C. § 2101, permissibly criminalized both acts and unprotected speech that incite or instigates a riot or that constitutes a true threat. *United States v. Rundo*, 2021 U.S. App. LEXIS 6304, 2021 WL 821938 at *7, 9 (9th Cir. Mar. 4, 2021). Furthermore, to the

35

extent that Section 231(a)(3) might apply to speech in hypothetical scenarios that are not present in this case, such speech is likely to be unprotected because it is integral to the criminal conduct of obstructing police or firefighters. *See United States v. Stevens*, 559 U.S. 460, 468–69 (2010) (including "speech integral to criminal conduct" as a class of speech "which ha[s] never been thought to raise any Constitutional problem" (internal citations omitted); *Williams*, 553 U.S. at 298 ("Many long established criminal proscriptions — such as laws against conspiracy, incitement, and solicitation — criminalize speech (commercial or not) that is intended to induce or commence illegal activities."); *Giboney*, 336 U.S. at 498 ("[T]he constitutional freedom of speech and press "does not "extend[ ] its immunity to speech or writing used as an integral part of conduct in violation of a valid criminal statute.")

Contrary to Pugh's arguments, Section 231(a)(3) does not apply to protected speech or conduct, such as criticizing law enforcement through yelling or gestures. Furthermore, Pugh cites no cases in which this statute has been applied to conduct that merely annoys or offends police or firefighters. As the Supreme Court has explained, the "mere fact that one can conceive of some impermissible applications of a statute is not sufficient to render it susceptible to an overbreadth challenge." *Williams*, 553 U.S. at 303 (quoting *Taxpayers for Vincent*, 466 U.S. at 800).

### (iv) Section 231(a)(3) Has a Plainly Legitimate Sweep.

As discussed above, Section 231(a)(3) has a legitimate sweep of targeting unprotected conduct. Pugh has not cited to any actual prosecutions under Section

231(a)(3) that she argues are unconstitutional.  Furthermore, Pugh raises only a facial challenge to the statute in her motion, because her own conduct — violently using a metal baseball bat to attack a police vehicle being used as part of a barricade to keep individuals from occupying I-10 — is certainly not constitutionally protected speech or expression.  Pugh's actions are exactly the type of conduct Section 231(a)(3) legitimately targets.

Pugh attempts to argue that Section 231(a)(3) is "impermissibly overbroad" relative to its "plainly legitimate sweep."  *See Washington State Grange v. Washington State Republican Party*, 552 U.S. 442, 449 n.6 2008).  To do so, Pugh relies on the unfortunate "tendency of [the] overbreadth doctrine to summon forth an endless stream of fanciful hypotheticals."  *Williams*, 533 U.S. at 301.  However, her hypotheticals miss their mark.  This is because Section 231(a)(3), properly construed, does not criminalize the very speech that Pugh describes in her hypotheticals.

Facial invalidation of a statute due to overbreadth is only warranted when a statute presents a "realistic danger" of chilling speech of third parties.  *Taxpayers for Vincent*, 466 U.S. at 801.  This is Pugh's motion and it is her burden.  She has failed to show any such "realistic danger" here.  Thus, she has failed to demonstrate that Section 231(a)(3) is "impermissibly overbroad" relative to its "plainly legitimate sweep."

### (v) Strict Scrutiny Does Not Apply Because Section 231(a)(3) Does Not Cover Protected Speech.

Pugh argues this Court should employ strict scrutiny review when analyzing Section 231(a)(3), because she claims the statute is a content and viewpoint-based

restriction on speech.   She is incorrect.   As previously explained, the statute only prohibits intentional obstructive conduct and unprotected speech directly linked to such conduct.

However, even if Section 231(a)(3) regulated speech to a degree that a level of scrutiny applied to this analysis, the Court should apply intermediate scrutiny under *United States v. O'Brien*, 391 U.S. 367 (1968).   This would be the appropriate level of scrutiny because Section 231(a)(3) regulates conduct that only incidentally affects speech and applies irrespective of any expressive content.

Section 231(a)(3) easily survives intermediate scrutiny because it is narrowly tailored to advance important governmental interests in enabling police and firefighters to protect channels of interstate commerce from being disrupted by civil disorders. Pugh's misplaced reliance on isolated statements from Senator Long does not transform this statute — which on its face, applies neutrally regardless of the viewpoint underlying a defendant's obstructive conduct — into impermissible viewpoint discrimination.

> **(5)   Pugh Has Not Met Her Burden, so Her Overbreadth Claim Must be Rejected.**

Pugh has failed to establish that Section 231(a)(3) targets constitutionally protected activity, and she certainly has not demonstrated that such protected activities are "substantial, not only in an absolute sense, but also relative to the statute's plainly legislative sweep." *See Dean*, 634 F.3d at 1206.   This is Pugh's motion, and therefore, her burden. *Hicks*, 539 U.S. at 122; *Dean*, 635 F.3d at 1204.   She has not come close to

carrying the high burden to establish overbreadth.   Accordingly, her motion to dismiss based on alleged overbreadth must be denied.

## V.   Pugh Lacks Standing to Raise a Facial Vagueness Challenge, But Her Argument is Meritless Regardless.

Pugh's final constitutional challenge to Section 231(a)(3) is that the statute is void for vagueness, in violation of the Fifth Amendment.   Specifically, Pugh claims the following terms are too vague to satisfy the requirements of Due Process — (1) "any act"; (2) "to obstruct, impede, or interfere"; (3) "incident to and during the commission of a civil disorder"; (4) "in any way obstructs, delays, or adversely affects commerce"; and (5) "civil disorder".   [Doc. No. 52, p. 33]   However, Pugh does not appear to challenge the statute as being vague as applied to her case.   Thus, it appears Pugh is making only a facial vagueness challenge — for which she lacks standing.

### A.   Pugh Lacks Standing to Raise a Facial Vagueness Challenge to Section 231(a)(3) if the Statute is Not Vague as Applied to Her.

As a threshold matter, the Court must determine whether Pugh has standing to raise a vagueness challenge to Section 231(a)(3).   Based on her brief, it appears as if she is only raising a facial vagueness challenge to the statute, and is not arguing that Section 231(a)(3) is unconstitutionally vague as applied to the specific facts of her case.   *See* [Doc. No. 52, pp. 32–37]   If so, then Pugh lacks standing to raise a facial challenge.

The issue of standing to raise facial vagueness challenges to a statute has been directly addressed in this Circuit.   The Eleventh Circuit has explained the following:

[A] party to whom application of a statute is constitutional will not be heard to attack the statute on the ground that impliedly it might also be

> taken as applying to other persons or other situations in which its application might be unconstitutional. The rule developed from the recognition that constitutional rights are personal in nature; that prudential concerns counsel for limiting the scope of constitutional adjudications; and that Article III of the Constitution limits the jurisdiction of federal courts to actual cases and controversies. . . . In articulating this general rule in the context of void-for-vagueness challenges under the Due Process Clause, the Supreme Court has stated that a plaintiff who engages in some conduct that is clearly proscribed cannot complain of the vagueness of the law as applied to conduct of others. Recently, the [Supreme] Court clarified that the rule makes no exception for vagueness challenges that implicate the First Amendment. This clarification addressed a tendency of courts to analyze such vagueness challenges together with First Amendment overbreadth challenges, which are exempt from this rule.

*DiPietro*, 615 F.3d at 1371–72. Thus, Pugh must demonstrate Section 231(a)(3) is vague as applied to her *before* she can raise a facial vagueness challenge on behalf of others. Since she has failed to do so, her facial vagueness arguments should be dismissed due to her lack of standing.

### B.   Even if Pugh Has Standing to Raise a Facial Vagueness Challenge, Such Challenge Fails.

For the reasons stated in the previous section, the United States contends that this Court should reject Pugh's facial vagueness arguments for lack of standing. However, even if this Court were to find that Pugh had standing, her challenge fails because of the scienter requirement that can, and should, be read into Section 231(a)(3).

Last fall, the *en banc* Eleventh Circuit provided the following synopsis of the relevant law related to vagueness challenges to statutes:

> Under the Due Process Clause, a law is void for vagueness if it fails to give ordinary people fair notice of the conduct it punishes or is so standardless that it invites arbitrary enforcement. But a law is not vague because it may

> at times be difficult to prove an incriminating fact.  Instead, a law is vague
> when it is unclear *as to what fact must be proved*.  And even laws that are in
> some respects uncertain may be upheld against a vagueness challenge if
> they contain a scienter requirement.

*Jones v. Gov. of Fla.*, 975 F.3d 1016, 1047–48 (11th Cir. 2020) (*en banc*) (original emphasis)

(internal citations and quotations omitted).

In her brief, Pugh argues that Section 231(a)(3) is unconstitutionally vague because the statute "provides no express *mens rea* at all, leaving police, prosecutors, and judges to decide whether the statute requires knowledge (and if so, of what) or specific intent (and if so, to do what) or neither." [Doc. No. 52, p. 34]  However, this argument falls apart because, as previously explained, Section 231(a)(3) can, and should, be construed to require proof of intent.  As the Supreme Court "has made clear[,] scienter requirements alleviate vagueness concerns."  *Gonzales v. Carhart*, 550 U.S. 124, 129 (2007); *accord Jones*, 975 F.3d at 1048 (noting that "even laws that are in some respects uncertain may be upheld against a vagueness challenge if they contain a scienter requirement").

Accordingly, even assuming, *arguendo*, that Pugh has standing to raise a facial vagueness challenge, the scienter element construed into Section 231(a)(3) would defeat her challenge on its merits.

### CONCLUSION AS TO ALL CONSTITUTIONAL CHALLENGES

For the reasons stated herein, this Court should reject all of Pugh's challenges to the constitutionality of Section 231(a)(3).

## CHALLENGE TO THE SUFFICIENCY OF HER INDICTMENT

In additional to her constitutional challenges to Section 231(a)(3), Pugh makes a brief alternative argument that dismissal is warranted because the indictment is deficient. Specifically, Pugh claims the lack of specificity in the Indictment fails to provide her sufficient notice, and that it also leaves open questions about whether sufficient facts were presented to the grand jury to support the Indictment. [Doc. No. 52, pp. 37–39] These arguments lack merit and should be rejected.

The Federal Rules of Criminal Procedure require that an indictment be "a plain, concise, and definite written statement of the essential facts constituting the offense charged." Fed. R. Crim. P. 7(c)(1). The Eleventh Circuit has expounded on this by consistently explaining that an indictment is legally sufficient when it does the following three things: "(1) presents the essential elements of the charged offense, (2) notifies the accused of the charges to be defended against, and (3) enables the accused to rely upon a judgment under the indictment as a bar against double jeopardy for any subsequent prosecution for the same offense." *See, e.g., United States v. Schmitz*, 634 F.3d 1247 (11th Cir. 2011); *see also United States v. Jordan*, 582 F.3d 1239, 1245 (11th Cir. 2009); *United States v. Steele*, 178 F.3d 1230, 1233–34 (11th Cir. 1999). Pugh appears to only be challenging the second prong — *i.e.*, whether she has received sufficient notice of the charge to be defended against.

As an initial matter, Pugh's claim that she does not have sufficient notice of the facts underlying the indictment is preposterous. Pugh was first charged via compliant,

which contained an affidavit meticulously detailing the facts underlying the charge. *See* [Doc. No. 1] Furthermore, she has received full discovery in this case. If there was any legitimacy to her argument that she did not understand the charges against her, Pugh could have filed a motion or a bill of particulars. She has not done so.

Second, following her citations to general Fifth Amendment principles, Pugh's only authority for her attack on the format of the indictment is *United States v. Du Bo*, 186 F.3d 1177 (9th Cir. 1999). However, *Du Bo* is inapposite, because the fatal flaw with the indictment in that case was that it failed to properly allege an offense. *Id.* at 1179–80. That failure explains the Ninth Circuit's concern for whether the defendant was convicted on the basis of facts "perhaps not even presented to [ ] the grand jury that indicted him." *Id.* at 1179 (internal quotations omitted). Notably, Pugh does not claim her indictment fails to allege an offense. Thus, the citation to *Du Bo* is irrelevant.

The indictment returned by the grand jury conforms with all requirements of FED. R. CRIM. P. 7(c). Accordingly, Pugh's alternative argument for dismissal should be rejected.

## CONCLUSION

For all the reasons set out herein, Pugh's motion to dismiss the indictment, [Doc. No. 52], should be denied.

Respectfully submitted this 26th day of March, 2021.

SEAN P. COSTELLO
UNITED STATES ATTORNEY

By: /s/ *Christopher J. Bodnar*
Christopher J. Bodnar
Assistant United States Attorney
63 South Royal Street, Suite 600
Mobile, Alabama 36602
(251) 441–5845
christopher.bodnar@usdoj.gov


By: /s/ *Justin D. Kopf*
Justin D. Kopf
Assistant United States Attorney
63 South Royal Street, Suite 600
Mobile, Alabama 36602
(251) 441–5845
justin.kopf@usdoj.gov


By: /s/ *Michael J. Dittoe*
Michael J. Dittoe
Trial Attorney
United States Department of Justice
National Security Division, Counterterrorism Section
950 Pennsylvania Ave, N.W., Room 7619A
Washington, D.C.  20530
michael.dittoe2@usdoj.gov