IN THE UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

UNITED STATES OF AMERICA,     *
     *
     VS.     *     CRIMINAL NO.  CR-20-00073-TFM
     *
TIA DEYON PUGH,     *
     *
     Defendant.     *

## REPLY TO GOVERNMENT'S RESPONSE
## TO DEFENDANT'S MOTION TO DISMISS INDICTMENT

COMES NOW the Defendant, TIA DEYON PUGH, by and through undersigned counsel, and files her Reply to the Government's Response to her Motion to Dismiss Indictment.

**Introduction**

The words of the legislators establish that racial prejudice and vindictiveness toward civil rights advocacy animated subsection 3 the Civil Obedience Act. The government's response on the factual background is wrong on the legislative history of 18 U.S.C. § 231(a)(3) and irrelevant on the events that led to the government's revival of this statute after 50 years of well-deserved obscurity. The government's claims regarding events last May in Mobile skew the facts through omissions, errors, and irrelevancies. Indeed, the government uses the first fourteen (14) pages of their response, nearly a third of the overall document, complete with color photos and unnecessary spin, in a *Wizard of Oz-esque* effort to avert the court's attention from the true focus of Pugh's motion: the validity of the statute. Whether Pugh broke a window is not the issue, rather the statute's illegitimate use of the commerce clause to invoke jurisdiction over state matters. The

government's legal arguments depend on cases addressing statutes that were legislatively fixed after judicial invalidation. Section 231(a)(3) has never been fixed. The primary case upon which the government relies – *United States v. Williams*, 553 U.S. 285 (2008) – upheld a rewritten statute after the Ninth Circuit and Supreme Court struck down its predecessor as unconstitutional in *Free Speech Coalition v. Reno*, 198 F.3d 1083 (9th Cir. 1999), *affirmed sub nom. Ashcroft v. Free Speech Coalition*, 535 U.S. 234 (2002). The unreconstructed § 231(a)(3) violates the Commerce Clause, the First Amendment, and the Due Process Clause. After five decades of the statute's obsolescence, it is long past time to permanently remove this stain from the criminal code.

1. **The Relevant Legislative History Fully Supports Dismissal Of The Indictment.**

The government's characterization of Ms. Pugh's quotations from the legislative history behind § 231(a)(3) as "cherry-picked misrepresentations" is far more readily applicable to the government's own selective references to the legislative history. Response at 16. Rather than evaluate the statements of legislators within their historical context, the government ignores the preponderance of the legislative history behind § 231(a)(3) that demonstrates the animating discrimination against civil rights advocacy. *Id.* The government urges that the Court read § 231(a)(3) as a "civil rights" law by taking a "broader look at this statute's legislative history," which would ignore the hostility against the civil rights movement and that propelled § 231(a)(3) to enactment. *Id.* at 17. Section 231(a)(3) cannot be labeled a "civil rights" law under any sense of that that expression because the law was adopted in order to weaken and undermine the civil rights guaranteed under the hate crime law. ECF 52, Motion at 4-5; ECF 54, Exhibit 1 at

1-8. The impermissible animus behind § 231(a)(3) has been apparent since the statute's inception.

The government claims that the legislative history asserted by the defense relate "not to Section 231(a)(3), but rather to earlier proposed legislation." ECF 66, Response at 16. Not so. Other than brief reference to quotations for the purpose of demonstrating Senator Long's commitment to white racial superiority and segregation, ECF 52, Motion at 4, the legislators' statements pertain directly to the procedures underlying § 231(a)(3)'s enactment. The government's claims about the legislative history behind § 231(a)(3) fail to reckon with the fact that the statute's supporters intended to undermine the "hate crime" title proposed under the Civil Rights Act of 1968. ECF 52, Motion at 4-5.

Context demonstrates the relevance of the full legislative history. In a Senate hearing in which Senator Long first introduced the language of § 231(a)(3), he devoted most of his time to criticizing the hate crime title before providing only a brief summation of the amendment that he proposed to counteract it. *Compare* ECF 54, Exhibit 1 at 1-8 (expressing disfavor for the hate crime title) *with* ECF 54, Exhibit 1 at 8-11 (introducing the Civil Obedience Act, including § 231(a)(3)). He expressed repeatedly throughout his testimony that his amendment was designed to roll back the legal protections that he believed the hate crime title would extend to Black activists, advocates, and leaders within the civil rights movement. ECF 54, Exhibit 1 at 8-12; *see also* ECF 54, Exhibit 3 at 1-3; ECF 54, Exhibit 4 at 1-2.

A week before introducing § 231(a)(3), Senator Long lambasted the hate crime law by predicting that it would shield people subjected to violence while engaging in what Senator Long perceived to be criminal behavior:

> We are not worried about someone trying to intimidate someone from
> voting. That is not the problem. It does not exist in my State. It does not
> happen. . . . We do have a problem with Stokely Carmichael and H. Rap
> Brown and others of their ilk who are stirring up some of our fine citizens
> in Louisiana and giving the wrong ideas that everyone is trying to do
> something evil to them because they are of a different race.'

ECF 54, Exhibit 3 at 4. In the hearings that followed, Senator Long would reformulate

and repeat this same intention over and over again. For example:

- He predicted that the hate crime title would place an "unwitting stumbling
  block . . . before States and local officials in their honest attempts to detain
  and prosecute incendiary rabblerousers" ECF 54, Exhibit 1 at 3.

- He quoted a newspaper article into the record that claimed the hate crime
  title was "tailor-made for Negro extremists who would be protected, by
  reason of their race, from the natural consequences of extremism." *Id.* at 4.

- He complained that the hate crime title would only serve to "protect
  Stokely Carmichael when he goes to these places sowing the seeds of
  hatred," and that it would "benefit Stokely Carmichael in his conduct,"
  which Senator Long claimed was "the last thing the people of America
  want." ECF 54, *Id.* at 8.

- He observed that the United States "seeks to avoid the sad duty of
  prosecuting a civil rights leader who starts a riot," and he therefore
  proposed § 231(a)(3) to create a federal "duty" to prosecute such
  individuals that the government "cannot shirk." ECF 54, Exhibit 2 at 6.

- He compared the hate crime law to developments in Supreme Court
  precedent, which he said "protected the criminal from society, rather than
  moving in the other direction, the protection of society from criminals."
  *Id.* at 3.

- He described the hate crime title as "a bill called a civil rights bill, but
  actually a bill that will enthrone such persons [as Stokely Carmichael, and
  Rap Brown] at the expense of other Americans." ECF 54, Exhibit 3 at 2.

Accordingly, § 231(a)(3) was designed specifically to facilitate the silencing and

imprisonment of Black civil rights advocates whom Senator Long feared that the hate

crime law would protect. ECF 54, Exhibit 1 at 11 ("If we are going to seek to pass a civil

rights bill, it should be a bill that would protect the public from irresponsible rabble rousers.").

The government attempts to portray Ms. Pugh's quotations to the legislative history as "cherry-picked misrepresentations" in light of their "exclusive focus" on Senator Long, the lone author of § 231(a)(3) who personally moved the amendment through the legislative process. ECF 66, Response at 16. However, Senator Long's animus towards the civil rights movement was not extraordinary or unique, but commonplace among his allies in the Senate. In fact, a coalition of Senators who harbored hostility towards the civil rights movement joined together in supporting the provisions of Senator Long's amendment to remedy the perceived shortcomings of the hate crime title.

Senator Allen Ellender of Louisiana complained that the hate crime bill would "protect[] anarchists such as [civil rights organizers] Rap Brown and Stokely Carmichael who go about the country stirring up trouble," while imposing a "lengthy sentence" on the "party charged" when "a troublemaker is injured while inflaming the local people." 114 Cong. Rec. 1154 (Jan. 26, 1968). Senator Benjamin Jordan of North Carolina recalled when "a group of Negroes descended on the House Gallery" and hypothesized that "any of those Negroes could have invoked the Federal [hate crime] law against our own policemen right here because of claimed police brutality." 114 Cong. Rec. 1160 (Jan. 26, 1968). Senator Herman Talmadge of Georgia worried that the hate crime bill would penalize a person who "hit Rap Brown with an open hand while he was causing people to riot and drew a little blood." ECF 54, Exhibit 4 at 2. Senator Strom Thurmond of South Carolina worried that the hate crime title would "lend encouragement to wild-

eyed, extreme leftwing people who do not seem to understand our country and what it stands for, people who do not love the Republic or the Constitution, but are willing, under the pretense of so-called civil rights, to create dissension and disorder." ECF 54, Exhibit 3 at 2.  Because Senator Long's motivations reflect those of a coalition of segregationist senators who had coalesced in opposition to the hate crime title and who supported criminalizing civil rights activism, no "cherry-picking" or "misrepresentation" occurs in providing the full context that demonstrate the discriminatory legislative purposes. It is only by ignoring Senator Long's sustained hostility to the civil rights movement and civil rights legislation that the government can claim that Ms. Pugh "fails to address the fact that Senator Long ultimately voted *against* [The Civil Rights Act of 1968], which contained Section 231." ECF 66, Response at 16 (emphasis in original). Senator Long made his intentions in this regard clear when he first presented § 231(a)(3), declaring that "it would be better to junk the entire statute and forget about it." ECF 54, Exhibit 1 at 6. He never intended to vote in favor of his own Civil Obedience Act amendment because he offered it for the purpose of weakening and undermining the civil rights legislation that he was already determined to vote against.

The gamesmanship behind § 231(a)(3) was not lost on members of the House Rules Committee who lamented that that "enemies of civil rights legislation per se" had intentionally caused the civil rights bill to be "weighted down with matters and issues that are decidedly extraneous to the whole question of civil rights." ECF 54, Exhibit 6 at 34. The fact that Senator Long voted against the omnibus civil rights legislation after having voted to adopt his own amendment into that legislation can only support the conclusion

that § 231(a)(3) was adopted in bad faith, as a "poison pill" amendment designed to undermine the goals of the hate crime title.[1]

By disregarding and downplaying the clear animus against the civil rights movement at the core of § 231(a)(3), the government seeks to cast a felony prohibition on interference with state officers as somehow germane to the "bipartisan civil rights legislation" that it was grafted onto. ECF 66, Response at 17. As Ms. Pugh has established, the Congressional Record demonstrates the opposite. Rather than seeking to advance the cause of civil rights, a significant number of legislators who voted to adopt § 231(a)(3) sought to sabotage the Civil Rights Act of 1968 and undermine the civil rights movement.

**A.     The Government's Flawed Account Of The Mobile Protests Is Not Only Inaccurate But Irrelevant To The Constitutionality Of A Statute That Must Be Judged Based On The Facts At The Time Of Enactment And On Its Overbroad And Vague Text.**

The government's account of local demonstrations provides little useful information for determining the constitutionality of the 1968 civil disorder statute. The prosecutions strategy appears to be an effort to influence the Court's decision by over-emphasizing the facts of the case to distract from the legal deficiencies in their argument. The statute's meaning does not change after enactment based on new facts or considerations. *See United States v. Aguilera-Rios*, 769 F.3d 626, 631 (9th Cir. 2014) ("Decisions of statutory interpretation are fully retroactive because they do not change

---

[1] "Senate rules also allow Senators to use the legislative amendment process to try and delay legislation once it reaches the floor or include an unfavorable 'poison pills' amendment that might ensure a bill's defeat." Neil Weare, *Equally American: Amending the Constitution to Provide Voting Rights in U.S. Territories and the District of Columbia*, 46 Stetson L. Rev. 259, 285 (2017)

the law, but rather explain what the law has always meant.") (quoting *United States v. Rivera-Nevarez*, 418 F.3d 1104, 1107 (10th Cir. 2005) (citing *Rivers v. Roadway Express Inc.*, 511 U.S. 298, 312-13 (1994)).   The government also references federal matters where federal statutes already fill any societal need and state matters easily addressed within the state criminal justice system. Most basically, the breadth and motivation behind the statute at the time of enactment render it unconstitutional, regardless of whether "there is some conduct that clearly falls within the provision's grasp." *Johnson v. United States*, 576 U.S. 591, 602 (2016); *accord United States v. Stevens*, 559 U.S. 460, 473 (2010) (statute overbroad despite plainly legitimate applications).

      **1.**     **The Government's Characterizations Regarding The Protests Do Not Address Or Cure The Statute's Unconstitutionality.**

      Although claiming that the statute must be construed, the government fails to provide a meaningful summary of how the multiple vague and general terms in the statute can be narrowed without judicial legislation. *Compare* Motion at 20-23, 30-31 (challenging multiple statutory terms as vague and overbroad) *with* Response at 19 (asserting that § 231(a)(3)'s overbreadth can be narrowed within constitutional bounds by reading in an intent requirement). The face of the statute applies broadly to speech and expressive conduct during demonstrations against police conduct. The Supreme Court has been unequivocal that Congress, and not the courts, is responsible for rewriting unconstitutional statutes:

> "[T]his Court may impose a limiting construction on a statute only if it is 'readily susceptible' to such a construction." *Reno v. American Civil Liberties Union*, 521 U.S. 844, 884 (1997). We "'will not rewrite a ... law to conform it to constitutional requirements,'" *id.*, at 884-885 (quoting *Virginia v. American Booksellers Assn., Inc.*, 484 U.S. 383, 397 (1988), for doing so would constitute a "serious invasion of the legislative domain," *United States v. Treasury Employees*, 513 U.S. 454, 479, n. 26

> (1995), and sharply diminish Congress's "incentive to draft a narrowly tailored law in the first place," *Osborne* [*v. Ohio*, 495 U.S. 103 (1990). To read § 48 as the Government desires requires rewriting, not just reinterpretation.

*Stevens*, 559 U.S. at 481 (parallel citations and signals omitted); *see Iancu v. Brunetti*, 139 S. Ct. 2294, 2301 (2019) ("[E]ven assuming the Government's reading would eliminate First Amendment problems, we may adopt it only if we can see it in the statutory language."). Nothing in the statute provides bases for narrowing through construction, and the statute's sponsors indicated no limiting intention.

The Court has also been clear that the government does not allay concerns regarding a statute's constitutionality by assuring that it will be used wisely:

> But the First Amendment protects against the Government; it does not leave us at the mercy of *noblesse oblige*. We would not uphold an unconstitutional statute merely because the Government promised to use it responsibly.

*United States v. Stevens*, 559 U.S. 460, 480 (2010). The government claims to only use the statute because of Pugh's "violent" conduct. Response at 29. But that is not what the statute says: Unlike the federal obstruction statute, there is no element requiring force. Further, the government can provide no basis for assurances when, after 50 years of warranted disuse, the last administration trotted out the statute to federalize state crimes for seeming political purposes during a time it was using national protests as a law-and-order foil. *See* Michael Kunzelman, Michael Balsamo, Gillian Flaccus, *Lawyer: FBI enlisted Proud Boys leader to inform on antifa*, Associated Press (March 31, 2021) ("Antifa was the Trump administration's villainous scapegoat for much of last year's social unrest following the death of George Floyd.").

The many terms that are undefined and extremely broad by their dictionary terms foreclose judicial rewrite by construction without violating the separation of powers. Regardless, the government does not offer a coherent interpretation of the statute that is consistent with its text. For example, in its introduction and description of underlying facts, the government uses "violent" or variations on "dangerous" six times, Response 1-12, but then offers no requirement of such conduct in its interpretation of the statute. Nor could the statute support such a construction given the breadth of "any act," which, by its plain meaning, covers speech, expressive conduct, and criminal violence. The statute's plain text covers a world of activity protected by the First Amendment.

And an interpretation adding "force" as an element of the "any acts" would be impossible because Congress uses the word "forcibly" when it intends to qualify the term "impedes" in the context of federal officers, and also accompanies the term with the contextual "assaults," as in 18 U.S.C. § 111(a). The courts cannot add a qualifier that Congress intentionally omitted. Nevertheless, the government throughout its brief uses terms like "violent conduct" and examples of actual violence as describing the statute's coverage, without finding any such limiting language in the statute itself.

As with the lack of "violence," "force" or "forcibly," no language in the statute describes the mental element, the scope of "obstruct, impede, or interfere," the knowledge and relationship between the "any acts" and the attenuated "in any way or degree" commerce language. The hopelessly ill-defined "any act," the lack of a mental element, and other nebulous internal language in the statute all leave the statute open to the widest interpretation for the purposes of all constitutional analyses.

**B.      The Primary Case Relied Upon By The Government Perfectly Illustrates That Only Congress – Not The Courts – Has Authority To Rewrite Statutes To Cure Constitutional Defects.**

The government places primary reliance on *Williams*, citing the case repeatedly throughout its brief. Response at 29, 30, 31, 34, 35, 36, and 37. In doing so, the government fails to note that the Court upheld the statute in *Williams* only after its predecessor statute had been invalidated as unconstitutional, and after Congress had engaged in a thorough rewrite addressing and curing the statute's constitutional defects. Section 231(a)(3) is directly analogous to the statute invalidated *prior* to *Williams*, so the case perfectly illustrates that Congress, not the courts, provides the appropriate forum for the statutory rewrite needed to cure constitutional defects.

In *Free Speech Coalition v. Reno*, the Ninth Circuit held that the Child Pornography Prevention Act of 1996 violated the First Amendment for content-based discrimination and was also void for vagueness under the Due Process Clause for failing to clearly define what images were criminalized. 198 F.3d 1083 (9th Cir. 1999). The overbreadth of the statutory language rendered the statute unconstitutional:

> The language of the statute questioned here can criminalize the use of fictional images that involve no human being, whether that fictional person is over the statutory age and looks younger, or indeed, a fictional person under the prohibited age. Images that are, or can be, entirely the product of the mind are criminalized. The CPPA's definition of child pornography extends to drawings or images that "appear" to be minors or visual depictions that "convey" the impression that a minor is engaging in sexually explicit conduct, whether an actual minor is involved or not. The constitutionality of this definition is not supported by existing case law.

*Free Speech*, 198 F.3d at 1092. Despite the much greater public interest in suppressing child pornography than anything articulated about the present statute, the Ninth Circuit found that Congress had not established a compelling need for the restriction. *Id*. at 1094.

Similarly, the Ninth Circuit held that the statute violated the Due Process Clause requirement that criminal statutes not be vague. *Id.* at 1094-95. The statutory phrases did not establish reasonable certainty "about whose perspective defines the appearance of a minor, or whose impression that a minor is involved leads to criminal prosecution." *Id*. The Court found the phrases in question "highly subjective," and that, with "no explicit standard as to what the phrases mean," the statute provided insufficient notice of prohibited conduct and invited arbitrary and discriminatory enforcement. *Id*. The same type of vagueness infects the present statute. Motion at 30-31.

The Supreme Court affirmed based on First Amendment overbreadth without reaching vagueness. *Ashcroft v. Free Speech Coal.*, 535 U.S. 234, 258 (2002). The Court determined that the reach of the CPPA was overbroad in extending to virtual images. *Id.* at 250-51.

> *The Government may not suppress lawful speech as the means to suppress unlawful speech. Protected speech does not become unprotected merely because it resembles the latter.* The Constitution requires the reverse. "[T]he possible harm to society in permitting some unprotected speech to go unpunished is outweighed by the possibility that protected speech of others may be muted ...." *Broadrick v. Oklahoma*, 413 U.S. [601, 612 (1973)]. *The overbreadth doctrine prohibits the Government from banning unprotected speech if a substantial amount of protected speech is prohibited or chilled in the process.*

*Free Speech*, 535 U.S. at 255 (emphases added). Applying the same analysis to this case, it is clear that the overbreadth of "any act" in § 231(a)(3) is much more spacious and covers a wider scope of expressive conduct and speech than did the CPPA.

The Court in *Free Speech* also held that the provision banning depictions of sexually explicit conduct that are "advertised, promoted, presented, described, or distributed in such a manner that conveys the impression that the material is or contains a

visual depiction of a minor engaging in sexually explicit conduct" is substantially overbroad in violation of the First Amendment. *Id.* at 257-58. The overbroad "conveys the impression" language suffers the same defect as § 231(a)(3), which places the officer in the position of deciding whether the subjective standard of the statute – "obstruct, impede, or interfere with" the officer who decides whether "any act" has done those things – has been met. Motion at 31-33.

In *Williams*, after *Free Speech*, the Court upheld Congress's replacement statute against First Amendment and vagueness challenges. In doing so, the Court described the narrowing and specificity that saved the statute from vagueness, especially the definitional section explaining the meaning of the term "sexually *explicit* conduct" and the "commonsense canon of noscitur a sociis." *Williams*, 553 U.S. at 294-97 (emphasis in original). In contrast to the specificity required in *Williams* to uphold the statute, § 231(a)(3) remains in a far worse form than the CPPA invalidated in *Free Speech* and has never received a congressional make-over to bring it within constitutional bounds.

The unreconstructed civil disorder statute bears all the markers of unconstitutionality with none of the remedial steps illustrated by *Williams* as necessary for the statute to be valid. As the main case upon which the government relies, *Williams* fully supports the present statute's invalidation under the First Amendment and Due Process Clause and forecloses judicial rewriting of the statute.

**C.    The Civil Disorder Statute Does Not Directly Implicate Interstate Commerce, So The Statutory "In Any Way Or Degree" Cannot Meet The Requirement Of A "Substantial" Effect.**

The government provides no basis for finding the kind of federal interest required by the Constitution as a limitation on federal power. *See United States v. Morrison*, 529 U.S. 598, 618 n.8 (2000) ("With its careful enumeration of federal powers and explicit

statement that all powers not granted to the Federal Government are reserved, the Constitution cannot realistically be interpreted as granting the Federal Government an unlimited license to regulate."). The Commerce Clause's limitation on federal legislative authority, and reservation to the States of general police power, depends on "the distinction between what is truly national and what is truly local." *Id.* at 617-618 (citing *Lopez*, 514 U.S. at 568). A federal statute that criminalizes "any act" that interferes with a state officer, incident to a disturbance involving three or more people, that "in any way or degree" affects commerce, addresses a quintessentially local crime and unconstitutionally accretes to the federal government state police authority.

The government's position that the Commerce Clause encompasses individual acts to interfere with police and firefighters, as described under § 231(a)(3), "would effectually obliterate the distinction between what is national and what is local and create a complete centralized form of government." *Lopez*, 514 U.S. at 557 (quoting *NLRB v. Jones & Laughlin Steel Corp.*, 301 U.S. 1, 37 (1937)). In order to preserve the federalism and separation of powers enshrined in the Constitution, the Court should invalidate the commercial means of committing § 231(a)(3) under the Commerce Clause.

     **1.**     **Section 231(a)(3) Does Not Narrowly Regulate The Channels Or Goods Of Interstate Commerce.**

The government claims that § 231(a)(3) is not only a regulation on "activity that substantially affects interstate commerce," but it also regulates "the channels of interstate commerce" and serves "to protect the flow of things in interstate commerce" within the meaning of *Lopez*. ECF 66, Response at 21. The government's position finds no support in § 231(a)(3)'s plain language. Section 231(a)(3) is not narrowly drafted as to apply only to activities impacting the channels of commerce or the flow of goods in commerce.

Neither the substantive offense of interfering with a police officer's duties, nor the incidental occurrence of a civil disorder that "in any way or degree" affects commerce, can reduce application of § 231(a)(3) to only those activities that impact the channels or goods pertaining to interstate commerce. The "in any way or degree" statutory language cannot reasonably be narrowed to fit the government's interpretation of civil disorders "prevents those law enforcement officers from restoring the channels and instrumentalities of interstate commerce." ECF 66, Response at 24. Because § 231(a)(3) prohibits intrastate, noneconomic activity that need not itself cause any impact to interstate commerce, the first two *Lopez* categories, which require direct impacts to commerce, cannot apply.

    **2.**    **The Unprecedented Attenuation Between The Prohibited Act And The Jurisdictional Element Of § 231(a)(3) Fails To Establish The Required Federal Nexus.**

The degree of attenuation between the substantive offense element and jurisdictional element of § 231(a)(3) is unprecedented: the government points to no other federal felony replicating this unique structure. By its own terms, the jurisdictional element of § 231(a)(3) contains no requirement that a defendant's actions implicate interstate commerce to any degree at all. Instead, it is the civil disorder, and not the defendant's offense conduct, that must be shown to have affected commerce.

Federal laws that regulate "forms of conduct that, even in the aggregate, may not substantially affect commerce" must contain a jurisdictional element so that their "applications . . . do not exceed Congress's authority." *Taylor v. United States*, 136 S. Ct. 2074, 2081 (2016). However, a jurisdictional element is no guarantee that Congress has acted within its authority. "[W]here a jurisdictional element is required, a meaningful one, rather than a 'pretextual incantation[] evoking the phantasm of commerce,' must be

offered." *United States v. Maxwell*, 446 F.3d 1210, 1218 (11th Cir. 2006) (quoting *United States v. Maxwell*, 386 F.3d 1042, 1062 (11th Cir. 2004)). The government's claim that § 231(a)(3)'s jurisdictional element "immunizes" the statute from any and every "facial constitutional attack" is incorrect. ECF 66, Response at 23 (quoting *United States v. Scott*, 263 F.3d 1270, 1273 (11th Cir. 2001)). All of the statutes that the government uses for comparison are distinguishable because, unlike § 231(a)(3), the crimes referenced all require that a defendant's activity directly impacted commerce or involved a commercial good.

The primary case on which the government relies, *Scott*, concerned the constitutional validity of 18 U.S.C. § 922(g)(1) under the Commerce Clause. 263 F.3d at 1271. In *Scott*, the Eleventh Circuit reaffirmed its pre-*Morrison* position by "holding that as long as the weapon in question has a 'minimal nexus' to interstate commerce, § 922(g)(1) is constitutional." *Id.* at 1274. That is, to be found guilty under § 922(g)(1), a defendant must actually come into possession of a marketable commercial good with demonstrable ties to interstate commerce. By contrast, under § 231(a)(3), a defendant need not come into contact with any good, channel, thing, or person of interstate commerce. Rather, a defendant need only interfere with a local official "incident to and during" a civil disorder that affects commerce. A defendant's possession of an actual commercial good under § 922(g)(1) is wholly distinguishable from a defendant's activity of interfering with local officials under § 231(a)(3). While several inferences are required to establish a commercial impact from acts of interference with police and firefighters, no such inference is necessary when it comes to the regulation of commercial goods like firearms. Accordingly, *Scott* is unhelpful to determining the issue presented here.

The government also cites to cases in which courts have upheld the Gun-Free School Zones Act, as amended post-*Lopez*, relying on *United States v. Thomas*, 810 F. App'x 789 (11th Cir. 2020) and *United States v. Dorsey*, 418 F.3d 1038 (9th Cir. 2005). ECF 66, Response 23. As with *Williams*, the courts in *Thomas* and *Dorsey* addressed a previously invalidated statute after Congress addressed the issues rendering it unconstitutional and, by amending the statute, established Commerce Clause compliance. By contrast with the present case, *Thomas* and *Dorsey* perfectly illustrate the invalidity of § 231(a)(3), which has had none of the congressional repair work that the courts addressed in those cases.

After *Lopez* invalidated the Gun-Free School Zones Act under the Commerce Clause, Congress amended the statute's language to require actual use of the channels of interstate commerce and made detailed congressional findings establishing bases for federal action. In *Dorsey*, the court addressed the new language that narrowed the offense to possession of a firearm that has "moved in or that otherwise affects interstate or foreign commerce" 418 F.3d at 1045. This jurisdictional element, the court recognized, established a "concrete tie to interstate commerce" by requiring, "through case-by-case inquiry, that the firearm possession in question affects interstate commerce." *Dorsey*, 418 F.3d at 1046. Section 231(a)(3) has no equivalent requirement.

Further, the amended statute reviewed in *Thomas* and *Dorsey* included extensive and detailed findings to establish a substantial effect on commerce. United States v. Thomas, 810 F. App'x 789, 796 (11th Cir. 2020) ("[Section] 922(q) also includes extensive congressional findings regarding the effects upon interstate commerce of gun possession in a school zone post-Lopez, such as that firearms move easily in interstate

commerce and that they move in interstate commerce during their manufacturing process.")

Unlike the general platitudes in the previous statute, and in § 231(a)(3), Congress considered and listed eight express and detailed findings establishing the effects on interstate commerce of guns in schools. 18 U.S.C. § 922(q)(1). Nothing remotely similar to such findings can be gleaned from what the government calls the "cherry-picked" remarks of § 231(a)(3)'s sponsor or any other part of the legislative history.

The jurisdictional element in the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1962, also provides no help to the government's arguments. ECF 66, Response at 26. Unlike § 231(a)(3), RICO can apply criminal liability to any enterprise "engaged in, or the activities of which affect, interstate or foreign commerce." 18 U.S.C. §§ 1962(a), 1962(b), and 1962(c). The government contends that RICO does "not require proof that a defendant personally affected commerce," citing to the Ninth Circuit's decision in *United States v. Juvenile Male*, 118 F.3d 1344, 1348 (9th Cir. 1997). No such proposition can be found in *Juvenile Male*, which to the contrary held that under the language of RICO, "the crime itself directly affects interstate commerce." 118 F.3d at 1348.  Rather than decide that a RICO defendant need not personally impact commerce, the court in *Juvenile Male* held that under RICO, it must be shown "that the crime had a 'de minimis effect' on interstate commerce." *Id.* at 1344. Section 231(a)(3), in contrast to RICO, does not require that "the crime itself directly affects interstate commerce," *id.* at 1348, because interference with local officials implies no commercial impact in itself.

Finally, the government's reference to the Supreme Court's decision in *McLain v. Real Estate Bd. of New Orleans, Inc*., 444 U.S. 232, 246 (1980), which addressed the

Sherman Anti-Trust Act's jurisdictional element, is also unavailing. Response at 20. The Court in *McLain* held that an indictment under the Sherman Act must indicate that, "as a matter of practical economics," the defendant's offense had "a not insubstantial effect on the interstate commerce involved." 444 U.S. at 246. As with the other offenses, the Sherman Act also requires some showing that the defendant's offense conduct itself affected commerce. While recognizing the Commerce Clause to "extend beyond activities actually in interstate commerce to reach other activities that, while wholly local in nature, nevertheless substantially affect interstate commerce," the Court in *McLain* added, "it is not sufficient merely to rely on identification of a relevant local activity and to presume an interrelationship with some unspecified aspect of interstate commerce." *Id.* at 242.

The express terms of § 231(a)(3) – "in any way or degree" – require exactly such a nebulous connection to commerce and are not susceptible to construction that could resolve the gap between the offense of interfering with police or firefighters and a civil disorder's commercial impacts. "Civil disorders," as 18 U.S.C. § 232(1) defines them, can occur in any situation, in any place, at any time, so long as three individuals are engaged in actions of violence threatening danger to property. Given such breadth, the law has vast potential to sweep up individuals who, while interfering with the duties of police, are utterly lacking in culpability with respect to the civil disorder that affected commerce. Nothing in the language of § 231(a)(3) can safeguard such individuals from liability for a federal felony conviction because the statutory language simply cannot be contorted to require that any commercial effect at all result from a defendant's actual acts.

**3.**   *Raich* **Is Inapplicable Because Section 231(a)(3) Does Not Form An Essential Part Of Any Comprehensive Regime Of Commercial Regulations.**

The government misplaces reliance on *Gonzales v. Raich*, 545 U.S. 1, 13 (2005). Response at 21, 25. The Supreme Court's decision in *Lopez* relied in part on the fact that the Gun-Free School Zones Act was "not an essential part of a larger regulation of economic activity, in which the regulatory scheme could be undercut unless the intrastate activity were regulated." *Lopez*, 514 U.S. at 561. In *Raich*, the Court upheld a regulation on intrastate marijuana cultivation for personal use because such a regulation was necessary to effectuate the commercial aims of the Controlled Substances Act (CSA) and therefor served "a larger regulation of economic activity." 545 U.S. at 13. Because the CSA's purpose was "to control the supply and demand of controlled substances in both lawful and unlawful drug markets," the "failure to regulate the intrastate manufacture and possession of marijuana would leave a gaping hole in the CSA." *Raich*, 545 U.S. at 19, 22. By contrast, enforcement of § 231(a)(3) is not necessary to effectuate any commercial regulation, nor to advance the goals of any federal regulatory scheme.

While the regulation of intrastate marijuana cultivation in *Raich* was part of a "comprehensive regime to combat the international and interstate traffic in illicit drugs," the Civil Obedience Act cannot be described as "comprehensive" in any way. *Raich*, 545 U.S. at 19. The clearest illustration of the relative "comprehensiveness" of the statutory schemes is simple numbers. Since the early 1970s, drug enforcement under the CSA has been massively regulated in federal courts, while § 231(a)(3) has been in almost complete hibernation:

- Controlled Substances Act: over 970,000 convictions.[2]

- The commerce prong of § 231(a)(3): 0 convictions or very close thereto.

For offenses under the CSA, the Sentencing Guidelines determine offense severity in direct proportion to the marketable quantity of the illicit contraband at issue. U.S.S.G. § 2D1.1. By contrast, § 231(a)(3) has so little connection to federal regulation that the offense, for 50 years, has not warranted prosecutions, nor has a guideline been promulgated to address the offense. The government can point to no "larger regulation of economic activity" involving this moribund statute.

The legislative history confirms the statute as a mere vestige of opposition to civil rights for Black Americans rather than a good faith effort to regulate commercial activity. The Senate rejected a majority of the provisions that Senator Long had originally included in his amendment, and, in the end, Senator Long said, "little is left." ECF 19, Exhibit 2 at 15. Whereas the Senate voted to adopt §§ 231(a)(1) and (a)(2) together in a single vote, § 231(a)(3) was approved on its own after a voice vote. Although both § 231(a)(1) and (a)(2) concern firearms and explosives, nothing suggests that § 231(a)(3) forms an "essential part" of any scheme of firearms and explosives regulation.[3] Because § 231(a)(3) was adopted in isolation after the Senate had rejected a majority of the Civil Obedience Act, it is "not an essential part of a larger regulation of economic activity." *Lopez*, 514 U.S. at 561. The provisions of the Civil Obedience Act are a far cry from the CSA's pervasive regime of drug regulations.

---

[2] Compiled from data available in the Annual Statistical Reports of the Offices of the United States Attorney, 1970-2019. https://www.justice.gov/usao/resources/annual-statistical-reports
[3] Although Senator Long mentioned snipers to appeal to gun control advocates, ECF 19, Exhibit B at 9, § 231(a)(3) as passed includes no reference to firearms. Furthermore, accounts of "black snipers" during the 1967 uprisings were later shown to be false and based in racial anxiety. James Ridgeway and Jean Casella, *Newark to New Orleans: The Myth of the Black Sniper*, Mother Jones (July 16, 2007), https://www.motherjones.com/politics/2007/07/newark-new-orleans-myth-black-sniper/.

With only the slightest reference to its legislative history, the government simply asks the Court to assume that Congress's enactment of § 231(a)(3) was founded on adequate findings and pure motives. ECF 66, Response at 21. The opposite is true. The legislative history behind § 231(a)(3) shows that the law was intended to silence civil rights leaders, not to help regulate interstate commerce. In offering § 231(a)(3), Senator Long sought "to pass a law . . . to do something to keep people like Stokely Carmichael and Rap Brown from going around accusing all the American people of being a bunch of murderers and assassins, which we are not, accusing us of being international criminals, which we are not." ECF 19, Exhibit 4 at 1. Accordingly, the law's commercial element was worded to not "leave available to Rap Brown or Stokely Carmichael the technical defense that they did not cross the State boundary with the intent to create a riot." ECF 19, Exhibit 2 at 3. Congress therefore intended that § 231(a)(3) be used to suppress and chill activists' support for civil rights and criticism of the government, only including a token commercial element to accomplish its non-commercial purpose. *See United States v. Maxwell*, 446 F.3d 1210, 1218 (11th Cir. 2006) ("[W]here a jurisdictional element is required, a meaningful one, rather than a 'pretextual incantation[] evoking the phantasm of commerce,' must be offered."). As in *Lopez*, the government here asks the Court "to pile inference upon inference in a manner that would bid fair to convert congressional authority under the Commerce Clause to a general police power of the sort retained by the States." *Lopez*, 514 U.S. at 567. If the Commerce Clause is to carry any force at all to maintain our federal form of government, then the commercial prong of § 231(a)(3) must be struck down.

**D.      The Civil Disorder Statute Violates The First Amendment Both As Over-Broad And As Motivated To Suppress A Particular Viewpoint.**

Section 231(a)(3) reaches a substantial amount of protected expression beyond its legitimate sweep, and the provision's enactment was motivated by the impermissible purpose of punishing and chilling viewpoints of the civil rights movement. The government contends that any potential First Amendment infirmities of § 231(a)(3) can be resolved by grafting a mens rea element into the provision for the purpose of confining its application to "those acts which are done with the intent to impede or obstruct." Response at 33. To the contrary, the wording of § 231(a)(3) is fatally afflicted with ambiguous, imprecise, and overbroad terms that work together to extend the law's application to a broad spectrum of expressive activity entitled to protection under the First Amendment. Moreover, although the government suggests that Congress intended for § 231(a)(3) to apply only to unprotected criminal acts, the legislative history of the Civil Obedience Act in fact shows that the law's proponents intended precisely to criminalize protected forms of political expression that derived from certain viewpoints and specific speakers.

**1.      Section 231(a)(3) Contains No Mental State Element, And Congress Intended It To Impose Minimal Burdens On Prosecutions.**

Section 231(a)(3) contains no mens rea element. The government focuses on "any act to obstruct, impede, or interfere" – language that offers no clarity as to the degree of mental culpability the provision requires as a matter of law. The government does not point to any federal felony statute that expresses a mental state requirement with the word "to" alone. This single word lacks specificity to connote the degree of mental knowledge and intent required for conviction.

The fact that § 231(a)(3)'s text itself requires no culpable mental state is confirmed by comparing its wording with the mental state requirements under §§ 231(a)(1) and (a)(2). A person can be found guilty under § 231(a)(1) for teaching the use of weapons or explosives while "knowing or having reason to know or intending that the same will be unlawfully employed for use in, or in furtherance of, a civil disorder." A conviction under § 231(a)(2) requires that a defendant transports or manufactures firearms or explosives while "knowing or having reason to know or intending that the same will be used unlawfully in furtherance of a civil disorder." "Where Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." *Gozlon-Peretz v. United States*, 498 U.S. 395, 404 (1991) (citing to *Russello v. United States*, 464 U.S. 16, 23 (1983)). Congress rejected the mental element the government now attempts to incorporate into subsection (3) of § 231(a).

Without an expressed mens rea element, the Court "must follow Congress' intent as to the required level of culpability for any particular offense." *United States v. Bailey*, 444 U.S. 394, 406 (1980). The legislative history behind § 231(a)(3) contains significant evidence that, contrary to the government's assertions, Congress intended the language of § 231(a)(3) to relieve prosecutors of the burden of proving the defendant's culpable mental state. In adopting the statute, Congress was "desirous of avoiding the problems of proof attendant upon establishing the intent of persons who crossed State lines." ECF 54, Exhibit 6 at 48. Senator Long regarded such a burden as "insurmountable" and "irrelevant." ECF 54, Exhibit 2 at 3. He complained that it would "leave available to Rap

Brown or Stokely Carmichael the technical defense that they did not cross the State boundary with the intent to create a riot." *Id*. In place of a mental state requirement in § 231(a)(3), Congress included only a commercial element also devoid of an explicit mens rea. Senator Long explained that, under this standard, a prosecutor would be required to "prove merely that commerce was interrupted," and having established that fact, "the one who started the riot can then be held responsible for interfering with it." ECF 19, Exhibit 2 at 3. The text, context, and purpose of § 231(a)(3) therefore contradict the government's interpretation of a narrowly drawn intent requirement.

In any event, the claimed mental element does not limit the statute's application to speech and expressive conduct. A person can use language, gestures, and other conduct in the hope of impeding police that is protected under the exacting standards of the First Amendment under *Brandenburg v. Ohio*, 395 U.S. 444, 448 (1969). Accordingly, the government's suggestion of a limiting construction to avoid constitutional problems, Response at 35, is misplaced because such an interpretation would conflict with legislators' clearly expressed purpose to deprive defendants of factual defenses related to their mental states and because it would still encompass protected activity.

> **2.      Section 231(a)(3) Burdens A Substantial Amount Of Protected Speech, Including Expressive Conduct**.

By marking a distinction between "conduct" and "protected expression," ECF 66, Response at 35, the government ignores the Supreme Court's protection of an array of "conduct" that falls under the speech protections of the First Amendment. The Constitution's speech protections extend to an array of conduct that, "on its face, does not necessarily convey a message." *Cohen v. California*, 403 U.S. 15, 18 (1971). The government's label of "conduct" is unhelpful for the legal determination at issue because

conduct and speech are not mutually exclusive. *See Anderson v. City of Hermosa Beach*, 621 F.3d 1051, 1061 (9th Cir. 2010) ("The tattoo *itself,* the *process* of tattooing, and even the *business* of tattooing are not expressive conduct but purely expressive activity fully protected by the First Amendment.) (emphases in original). The question is not whether the terms of § 231(a)(3) apply to conduct rather than speech. Instead, the relevant overbreadth inquiry is whether a substantial amount of the activities prohibited under § 231(a)(3) are "sufficiently imbued with the elements of communication" to warrant First Amendment protection." *Spence v. Washington*, 418 U.S. 405, 409 (1974).

"Expressive conduct is characterized by two requirements: (1) 'an intent to convey a particularized message' and (2) a 'great' 'likelihood ... that the message would be understood by those who viewed it.'" *Edge v. City of Everett*, 929 F.3d 657, 668 (9th Cir. 2019) (quoting *Texas v. Johnson*, 491 U.S. 387, 404 (1989)). Accordingly, so long as § 231(a)(3) burdens a substantial amount of activities intended to convey a message to an audience who would understand it, the provision is facially overbroad under the First Amendment.

Section 231(a)(3) burdens a substantial amount of speech and conduct imbued with communicative elements. Motion at 20-23. The provision criminalizes "any act" that could "interfere with" the "duties" of police and firefighters incident to a civil disorder involving three or more people. 18 U.S.C. § 231(a)(3). The term "interfere" is left undefined, as is "impede" and obstruct," permitting an expansive application to any form of expression that tends to interfere with, that is, to interrupt, a police officer's duties during a civil disorder. *See McCoy v. City of Columbia*, 929 F. Supp. 2d 541, 550 (D.S.C. 2013) ("the terms of the Ordinance undefined, it is not clear whether the Columbia City

Council intended the Ordinance to apply to physical conduct alone, and the court cannot say that the Ordinance is valid."). Section 231(a)(3) is not restricted by time or place, extending broadly across all venues including traditional public fora. *See Seattle Affiliate of Oct. 22nd Coal. to Stop Police Brutality, Repression & Criminalization of a Generation v. City of Seattle*, 550 F.3d 788, 797 (9th Cir. 2008) ("When the government seeks to regulate access to the streets, 'First Amendment protections are at their strongest and regulation is most suspect.'") (quoting *Long Beach Area Peace Network v. City of Long Beach*, 522 F.3d 1010, 1027 (9th Cir. 2008)). Rather than narrowing § 231(a)(3)'s application, the requirement of a contemporaneous "civil disorder" only ensures that the provision will be invoked to quell political demonstrations, both large and small, that are infused with a communicative purpose. For these reasons, § 231(a)(3) not only applies to pure speech, but the provision also places severe burdens on a substantial amount of protected conduct.

Section 231(a)(3) applies to non-violent speech and actions intended to communicate ideas. The government never contests the fact that the terms of § 231(a)(3) reach nonviolent protected expression. Although the government correctly asserts that § 231(a)(3)'s "legitimate sweep" of targeting unprotected conduct, Response at 36, this does not overshadow the fact that "a substantial number of its applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep." *Stevens*, 559 U.S. at 473. While some of the activities under § 231(a)(3) can be classified as violent and unprotected, "the First Amendment protects a significant amount of verbal criticism and challenge directed at police officers." *City of Houston, Tex. v. Hill*, 482 U.S. 451, 461 (1987). Section 231(a)(3) is susceptible to no interpretation that could prevent its

application to "a significant amount of verbal criticism and challenge directed at police officers," and the Court should invalidate it on this basis.

### 3. Strict Scrutiny Is Warranted Because § 231(a)(3) Was Intended To Suppress Disfavored Viewpoints Of Civil Rights Leaders

The overbroad terms of § 231(a)(3) only serve to advance the impermissible goal, articulated repeatedly throughout underlying legislative history, of suppressing disfavored viewpoints in support of civil rights and against white supremacy. The government offers little to contest this claim, contending only that "even if Section 231(a)(3) regulated speech to a degree,,,", then the Court should apply intermediate scrutiny rather than strict scrutiny. ECF 66, Response at 38. However, even if § 231(a)(3) were content-neutral on its face, which it is not, the Supreme Court has recognized that "[b]ecause strict scrutiny applies either when a law is content based on its face or when the purpose and justification for the law are content based, a court must evaluate each question before it concludes that the law is content neutral and thus subject to a lower level of scrutiny." *Reed v. Town of Gilbert, Ariz.*, 576 U.S. 155, 166 (2015).

The Supreme Court teaches that, contrary to the government's position, a law may be held to be impermissibly viewpoint-based where evidence shows the law was "adopted by the government 'because of disagreement with the message [the speech] conveys." *Reed*, 576 U.S. at 164 (quoting *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989)). Although the government references "cherry picked" statements, Response at 16, the legislative background behind § 231(a)(3) is replete with evidence of a purpose to silence particular viewpoints. Section 231(a)(3) was enacted in response to certain legislators' fear that Black civil rights activists would gain legal protections under the hate crime law that would "help" them to "carry on their conduct and to stir up hatred and

ill will among people of their race." ECF 54, Exhibit 1 at 4. Senator Long expressed hostility to specific speeches, writings, and communications, including Dr. King's *Letter From A Birmingham Jail*, as reasons for the legislation. *Id.* at 8. In response to a legislative record rife with illicit targeting, one Senator complained that, by enacting provisions of the Civil Obedience Act, Congress would "not be legislating . . . out of prudence," but rather would "be legislating in retaliation against Carmichael and Brown." ECF 54, Exhibit 2 at 10.

The impermissible viewpoint-discriminatory purpose behind § 231(a)(3) is evident from the unambiguous and repeated statements of legislators during its adoption. Therefore, § 231(a)(3) can be categorized among "additional category of laws that, though facially content neutral, will be considered content-based regulations of speech." *Reed*, 576 U.S. at 164.

**E.     The Statute's Multiple Ill-Defined Terms Fail To Provide Required Notice And To Protect Against Arbitrary And Discriminatory Enforcement.**

The government provides only a passing defense of the statute under the void for vagueness provision of the Due Process Clause. *Compare* Motion at 29-34 *with* Response at 39-41. The lack of certainty throughout the statute shifts the enforcement definitions from the legislature to police and prosecutors. Section 231(a)(3) provides no textual basis to limit the statute and no reason for the general public know citizens cannot be subjected to arbitrary and discriminatory enforcement. Because the statute does not define its terms, the terms must be read "in accordance with [their] ordinary or natural meaning." *FDIC v. Meyer*, 510 U.S. 471, 476 (1994). The ordinary meaning of the statute's terms are dangerously broad and depend on the reactions of the particular officer.

The government contends that the statute's vagueness can be saved by construction. Response at 33, 41 (citing *United States v. Mechanic*, 454 F.2d 849 (8th Cir. 1971). Most critically, *Mechanic* has long since been superseded by Supreme Court authority limiting judicial ability to rewrite statutes and requiring certainty to protect against the evils of vagueness articulated after those cases were issued. In *Mechanic*, the Eighth Circuit rejected the defendant's void-for-vagueness argument by determining that, under the law at that time, "defendants may not challenge [criminal statutes] as vague or overly broad if their own conduct may be constitutionally prohibited." *Mechanic*, 454 F.2d at 853.

Since *Mechanic* was decided, the Supreme Court has embraced facial vagueness challenges that may not apply to the specific case. *See Johnson*, 576 U.S. at 603 (rejecting the proposition that "a statute is void for vagueness only if it is vague in all its applications."); *Guerrero v. Whitaker*, 908 F.3d 541, 544 (9th Cir. 2018) ("*Johnson* and [*Sessions v. Dimaya*, 138 S. Ct. 1204 (2018)] expressly rejected the notion that a statutory provision survives a facial vagueness challenge merely because some conduct clearly falls within the statute's scope."). The decision in *Mechanic* is also at odds with the Supreme Court's later recognition of a "personal right not to be convicted under a constitutionally invalid law." *Bond v. United States*, 564 U.S. 211, 226 (2011).

Finally, the decision of the *Mechanic* court to append a requirement of "violence" to the acts prohibited under § 231(a)(3) finds no support in the statutory language and is inconsistent with later Supreme Court directives foreclosing judicial rewriting of a statute's plain terms. *See Nat'l Ass'n of Mfrs. v. Dep't of Def.*, 138 S. Ct. 617, 629 (2018) ("Of course, those are not the words that Congress wrote, and this Court is not free to

'rewrite the statute' to the Government's liking.") (citing *Puerto Rico v. Franklin Cal. Tax–Free Trust*, 136 S. Ct. 1938, 1949 (2016) ("[O]ur constitutional structure does not permit this Court to rewrite the statute that Congress has enacted."); *Stevens*, 559 U.S. at 481 (same).   The government does not appear to even offer such an indefensible interpretation of the statute.

The statute leaves individuals uncertain regarding criminalized conduct and "would delegate to prosecutors and juries the inherently legislative task of determining what type of . . . activities are so morally reprehensible that they should be punished as crimes." *United States v. Kozminski*, 487 U.S. 931, 949 (1988). By doing so, the statute unconstitutionally invites "arbitrary or discriminatory prosecution and conviction." *Id*.

## F.      The Indictment Fails To Comply With The Grand Jury Requirements Of The Fifth Amendment And Rule 7.

The government's defense of the Pugh indictment misapprehends the grounds for dismissal. Response at 42-43. The indictment fails in two ways: the indictment fails to incorporate the government's interpretive overlays required to describe the elements of the offense; and the indictment does not describe the facts that constitute the offense.

Section 231(3) is not amenable to judicial rescue by rewrite of its provisions to meet minimum constitutional standards. But even taking just one of the missing elements, controlling authority requires dismissal. The government, in the face of statutory silence on mens rea, asks the Court to read into the statute that a defendant's acts must be "*designed to* impede or obstruct." Response at 20 (emphasis added). But the grand jury never found such a mens rea – or any intent to commit the offense.  The right to indictment, obviously, is a shorthand reference to an individual's right to a grand jury's screening of potential prosecutions. Specifically, "[t]he very purpose of the requirement

that a [person] be indicted by grand jury is to limit his jeopardy to offenses charged by a group of . . . fellow citizens acting independently of either prosecuting attorney or judge." *United States v. Peel*, 837 F.2d 975, 978-79 (11th Cir. 1988) (quoting *Stirone v. United States*, 361 U.S. 212, 218 (1960)).

Moreover, as the caselaw developed and the courts began interpreting the Fifth and Sixth Amendments in tandem, an indictment's critical secondary function arose: notice. *See, e.g.*, *United States v. Woodruff*, 296 F.3d 1041, 1046 (11th Cir. 2002) ("By now, it is axiomatic that an indictment is sufficient if it (1) presents the essential elements of the charged offense, (2) notifies the accused of the charges to be defended against, and (3) enables the accused to rely upon a judgment under the indictment as a bar against double jeopardy for any subsequent prosecution of the same offense.") (citations and internal quotation marks omitted).

Here, the Fifth Amendment violation is worse. A Fifth Amendment charging document is principally aimed at "sufficiently appris[ing] the defendant of what he must be prepared to meet." *United States v. Bobo*, 344 F.3d 1076, 1083 (11th Cir. 2003); *see also United States v. Archibald*, 212 Fed. App'x 788, 793 (11th Cir. 2006). However, the statute's text includes no mental element; the indictment includes no mental element. Yet the government claims that the Court should read in a mental element. The indictment quotes the statute, so the grand jury did not need to find that the defendant acted with mens rea, the same defect recognized in *Keith* and expanded upon in *United States v. DuBo*, 186 F.3d 1177, 1180 (9th Cir. 1999) ("Du Bo's conviction also must be overturned because his indictment lacks a necessary allegation of criminal intent, and as such does not "properly allege an offense against the United States.") (quoting *United States v.*

*Morrison*, 536 F.2d 286, 289 (9th Cir.1976)). The basic protection included in the Fifth Amendment becomes meaningless when the grand jury essentially acts as a rubber stamp, without being required to find all the elements of a statute – especially the mental component – that are not apparent from the text.

To the same effect, the "any acts" that the government references are not specified, leaving the government free to vary from the theory of the case presented to the grand jury. While notice can be provided by alternative means, the grand jury itself limits the case the prosecution can present to the petit jury. "[A]fter an indictment has been returned its charges may not be broadened," although they may be narrowed. *United States v. Miller*, 471 U.S. 130, 143 (1985) (quoting *Stirone v. United States*, 361 U.S. 212, 215-16 (1960)). Thus, only by providing at least some specificity of the conduct alleged are the Fifth Amendment rights of defendants protected from expansion to any other behavior not presented to the grand jury that the prosecution could present at trial as a basis for conviction.

The indictment in the present case provides neither required notice nor protection of the interceding role of the grand jury of defining the offense to which a defendant must answer and limiting the prosecutor's presentation at trial.

**Conclusion**

For the foregoing reasons and those stated in the motion to dismiss, the Court should dismiss the indictment.

Respectfully submitted on April 12, 2021.

*s/GORDON ARMSTRONG*
Gordon G. Armstrong, III
Attorney at Law
P.O. Box 1464
Mobile, Alabama 36633
Telephone: 251-434-6428
gga3@arserv.com

## CERTIFICATE OF SERVICE

I certify that on this 12th day of April, 2021, I electronically filed the foregoing with the Clerk of the Court using CM/ECF system which will send notification of such filing to:

Christopher Bodner, Esq.
United States Attorney's Office
63 N. Royal Street, Suite 600
Mobile, AL. 36601

*s/GORDON ARMSTRONG*
Gordon G. Armstrong, III