IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | * | |
| | * | Criminal No. 20-cr-0073-TFM |
| v. | * | |
| | * | |
| TIA DEYON PUGH | * | |

## UNITED STATES' SENTENCING BRIEF

Comes now the United States, by and through Sean P. Costello, the United States Attorney for the Southern District of Alabama, and files this sentencing brief in the above-styled case. For the reasons stated herein, the United States recommends this Court sentence defendant Tia Pugh to a term of imprisonment within the correctly calculated guidelines range.

### RELEVANT PROCEDURAL HISTORY

On May 19, 2021, following a three-day trial, a jury unanimously convicted Pugh of obstructing law enforcement during the course of a civil disorder that affected interstate commerce, in violation of 18 U.S.C. § 231(a)(3). [Doc. No. 116] Pugh's sentencing hearing is set for August 19, 2021. [Doc. No. 117] In advance of this hearing a draft Presentence Investigation Report "PSR" was submitted, which recommended this Court sentence Pugh using only the factors set out in 18 U.S.C. § 3553(a), because the Probation Office concluded there is no sufficiently analogous guidelines section for convictions under 18 U.S.C. § 231(a)(3). [Doc. No. 130] The United States objected to this recommendation, and argued that U.S.S.G. 2A2.4 (entitled "Obstructing or Impeding Officers") is both sufficiently analogous and the most analogous guideline section to apply for convictions under § 231(a)(3). [Doc. No. 132] Following the United States' objection, a final PSR was filed in which the Probation Office maintained its position that there is no sufficiently analogous guidelines section. However, the addendum to the PSR notes that this "matter is left to the discretion of the Court" at sentencing. [Doc. Nos. 133, 134]

1

## CALCULATING PUGH'S ADVISORY GUIDELINES RANGE

### A.    Level 13 is the Properly Calculated Total Offense Level for Pugh.

Although the Guidelines are advisory, they "should be the starting point and the initial benchmark at sentencing." *Gall v. United States*, 552 U.S. 38, 49 (2007). For that reason, the Supreme Court has explained that district courts "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *Id.*

"[T]he first step in calculating a Guidelines range is to determine the offense guideline section applicable to the offense of conviction." *United States v. Cingari*, 952 F.3d 1301, 1309 (11th Cir. 2020). The United States incorporates all its arguments from its objection to the draft PSR herein and maintains that U.S.S.G. § 2A2.4 is both "sufficiently analogous" and the "most analogous" guidelines section to apply when a defendant is convicted under 18 U.S.C. § 231(a)(3). *See* [Doc. No. 132] For all the reasons stated therein, the United States urges this Court to apply § 2A2.4 when calculating Pugh's advisory guidelines range, in accordance with the language in U.S.S.G. § 2X5.1.

Applying § 2A2.4, Pugh's Base Offense Level is 10. U.S.S.G. § 2A2.4(a). This guideline section also includes a three-level enhancement if "a dangerous weapon . . . was possessed and its use was threatened." *Id.* (b)(2). The Sentencing Commission defines "dangerous weapon," in relevant part, as "an instrument capable of inflicting death or serious bodily injury." U.S.S.G. § 1B1.1, app. n. 1(E). As this Court and the jury saw during trial, Pugh used a metal baseball bat she brought from home to smash the window of a police vehicle set up as part of a barricade line to keep individuals occupying the interstate on ramp from going onto an elevated section of Interstate-10 in downtown Mobile. Thus, Pugh possessed, and not only threatened, but also *used* a dangerous weapon to commit her offense. Accordingly, the Court should apply this three-level enhancement and find that Pugh's Total Offense Level is 13.

B.  **Pugh has Not Carried Her Burden to Prove That She Should Receive a Reduction for Acceptance of Responsibility.**

A defendant is entitled to a reduction in her overall offense level if she "clearly demonstrates acceptance of responsibility for [her] offense." U.S.S.G. § 3E1.1(a). The Eleventh Circuit has made clear that it is the *defendant's* burden to show entitlement to this reduction. *United States v. Williams*, 408 F.3d 745, 756 (11th Cir. 2005).

Pugh was initially charged via criminal complaint on June 5, 2020. [Doc. No. 1] Following three days of trial, it took less than two hours for the jury to find the United States proved all the elements beyond a reasonable doubt, and accordingly, to convict Pugh. As the Eleventh Circuit recently explained, "The Federal Sentencing Guidelines note that a reduction for acceptance of responsibility 'is *not* intended to apply to a defendant who puts the government to its burden of proof at trial by denying the essential factual elements of guilt, is convicted, and only then admits guilt and expresses remorse.'" *United States v. Tercier*, 835 F. App'x 471, 488 (11th Cir. 2020) (emphasis in original) (unpublished).

Despite the presumption that a defendant who went to trial is not entitled to a reduction for acceptance of responsibility, such a defendant is not categorically precluded from receiving it. The Sentencing Guidelines recognize that there are *rare* circumstances where a defendant could still be eligible for this reduction even if she chose to go to trial:

> In rare situations a defendant may clearly demonstrate an acceptance of responsibility for his criminal conduct even though he exercises his constitutional right to a trial. This may occur, for example, where a defendant goes to trial to assert and preserve issues that do not relate to factual guilt (e.g., to make a constitutional challenge to a statute or a challenge to the applicability of a statute to his conduct). *In each such instance, however, a determination that a defendant has accepted responsibility will be based primarily upon pre-trial statements and conduct.*

U.S.S.G. § 3E1.1 cmt. n.2 (added emphasis).

The Probation Office did not take a position on whether Pugh should receive a reduction for acceptance of responsibility, but this was because the Probation Office took the omnibus position that the Sentencing Guidelines do not apply in this case at all. [Doc. No. 133, p. 6] However, the Probation Office noted in the PSR that although "Pugh exercised her constitutional right to trial . . . she did not deny culpability for the instant offense. Specifically, [Pugh] went to trial to assert and preserve issues that did not relate to factual guilt." [*Id.*] In support of this position, the Probation Office highlighted *post-conviction* statements from Pugh in which she expressed that she was "very sorry," and added, "I do regret it." Such post-conviction statements are insufficient for Pugh to carry her burden to demonstrate that she is entitled to a reduction for acceptance of responsibility. *Williams*, 408 F.3d at 756. This is especially so since the presumption is against her, and her *pre-conviction* statements and actions are completely incongruent with someone truly accepting responsibility.

During trial, the jury heard testimony that Pugh was not arrested immediately after she smashed the police car window. Rather, she fled from the scene. Pugh was identified two days later after news reports showed the video of her smashing the police car window. The jury also heard that when Mobile Police went to her apartment, her husband lied about Pugh living there, and that Pugh eventually ran out the back of the apartment leading to a foot-chase with police before she was taken into custody. None of these actions support the notion that Pugh accepted responsibility.

Furthermore, the jury watched Pugh's recorded post-arrest interview during which she explicitly *did not* accept responsibility. Rather, Pugh attempted to *justify* her actions:

**Det. Taylor:** So you — so you think it was right for you to be able to be on the interstate.

**Ms. Pugh:** Yeah, they have done it in 30-plus other states. We didn't instigate. We didn't escalate. I escalated, personally, on my own and no one followed behind me which they were supposed to do.

**Det. Taylor:** They were.

**Ms. Pugh:** We started that protest if anyone is violent you clear away from that person. You walk away from that person. You separate yourself from that person. And I am that person.

**Det. Taylor:** Okay. So that's y'all — so the group that you have, that's the rule, you do something —

**Ms. Pugh:** That's the way we started that protest when there were only six people out here to the point there were hundreds of people out there.

**Det. Taylor:** So —

**Ms. Pugh:** The idea in minds that we were behind.

**Det. Taylor:** So let me make sure I understand. So if we were protesting together and then you go bust a window out. When you do that, you run.

**Ms. Pugh:** Exactly. You run away from me. I stay where I stay and get it. That charge. I get it. Whatever may come, the repercussions of that.

**Det. Taylor:** So nobody made you do that?

**Ms. Pugh:** No.

**Det. Taylor:** You did it on your own —

**Ms. Pugh:** Nobody asked me. Nobody —

**Det. Taylor:** Okay because we want to —

**Ms. Pugh:** — talked me into that.

**Det. Taylor:** Right. We want to make sure nobody made you do that.

**Ms. Pugh:** No.

**Det. Taylor:** Own free will?

**Ms. Pugh:** Uh-huh.

**Det. Taylor:** And are you sorry that you did that?

**Ms. Pugh:** I mean, I'm sorry that police officer didn't get to harass another person later that day.

**Det. Taylor:** You are sorry?

| | | |
|---|---|---|
| **Ms. Pugh:** | | To some extent. |
| **Det. Taylor:** | | Okay. Right. You're just like, whatever? |
| **Ms. Pugh:** | | It's not whatever. It's definitely not whatever. I promise you it's not whatever. But I — I one hundred percent care. |
| **Det. Taylor:** | | Right. Okay. |
| **Ms. Pugh:** | | But that does not mean that I am sorry. |

*See* Attachment A (transcript), pp. 7–9 (recording admitted at trial as Gov't Ex. 19). Pugh's only pre-conviction statements expressing even the slightest bit of acceptance of responsibility or remorse are heavily steeped in her attempts to justify her actions.

The United States also disagrees with the Probation Office's assessment that Pugh "went to trial to assert and preserve issues that did not relate to factual guilt." [Doc. No. 133, p. 6] Pugh contested the facts of her case before the jury by challenging the sufficiency of the evidence and seeking to discredit the United States' witnesses. Her trial was not merely a mechanism to preserve legal issues for appeal.

In all cases, it is the defendant's burden to demonstrate that he or she is entitled to a guidelines reduction for acceptance of responsibility. *Williams*, 408 F.3d at 756. Pugh chose to go to trial, and therefore, the presumption is heavily against her. *Tercier*, 835 F. App'x at 488 (citing U.S.S.G. § 3E1.1 cmt. n.2). Pugh's post-conviction statements of remorse do not come close to meeting this burden, and, as will be discussed below, Pugh has not ceased her criminal conduct even after her conviction. Accordingly, the United States urges this Court to find that Pugh is not entitled to a reduction for acceptance of responsibility under the Sentencing Guidelines.

**C.     Conclusion as to Guidelines Range Calculations**

For the reasons stated herein, as well as those reasons incorporated herein, the United States respectfully requests this Court make the following findings regarding Pugh's guidelines calculations:

    (1)    Pugh's Base Offense Level is 10, pursuant to U.S.S.G. § 2A2.4(a);

    (2)    The three-level enhancement for possession a dangerous weapon is applicable, pursuant to U.S.S.G. § 2A2.4(b)(1); and

    (3)    Pugh has failed to carry her burden to establish that she is entitled to an acceptance of responsibility reduction.

Accordingly, this Court should find that Pugh's Total Offense Level is 13, and coupled with a Criminal History Category I, that Pugh's advisory guidelines range is 12–18 months.

### EVALUATING THE SENTENCING CONSIDERATIONS IN 18 U.S.C. § 3553(A)

The Sentencing Guidelines are no longer mandatory. *United States v. Booker*, 543 U.S. 220 (2005); *United States v. Magluta*, 418 F.3d 1166 (11th Cir. 2005) (holding that post-*Booker*, "all guidelines decisions are now advisory"). However, their advisory nature does not render the Sentencing Guidelines irrelevant. *United States v. Henry*, ___ F.3d ___, 2021 U.S. App. LEXIS 18413, *8–9 (11th Cir. Jun. 21, 2021) (published). "After *Booker*, a sentencing court must consult those Guidelines and take them into account when sentencing . . . but the Guidelines are no longer the final consideration." *Id.* *See also Kimbrough v. United States*, 552 U.S. 85, 90 (2007) (noting that "the Guidelines . . . now serve as one factor among several courts must consider in determining an appropriate sentence").

For these reasons, after properly calculating the advisory guideline range, the district court must consider the sentencing factors set out in 18 U.S.C. § 3553(a) when sentencing a defendant. Specifically, "[a] district court must impose a sentence that is 'sufficient, but not greater than necessary, to comply with the purposes' listed in 18 U.S.C. § 3553(a)(2), which include reflecting the seriousness of the offense, promoting respect for the law, providing just punishment, affording adequate deterrence, protecting the public from the defendant's further crimes, and providing the defendant with appropriate correctional treatment." *United States v. Taylor*, 997 F.3d 1348, 1354 (11th Cir. 2021) (citing 18 U.S.C. § 3553(a)). "In addition, the statute directs the district court to consider the types of sentences available, the applicable guideline range, any pertinent policy statement issued by

the Sentencing Commission, the need to avoid unwarranted sentencing disparities, and the need to provide restitution to victims." *Id.* (citing § 3553(a)(3)-(7)).

The weight given to any specific § 3553(a) factor is left to the district court's discretion[.]" *United States v. Fox*, 926 F.3d 1275, 1282 (11th Cir. 2019) (citing *United States v. Clay*, 483 F.3d 739, 743 (11th Cir. 2007)). The district court "may attach 'great weight' to one factor over others." *Taylor*, 997 F.3d at 1355 (quoting *United States v. Rosales-Bruno*, 789 F.3d 1249, 1254 (11th Cir. 2015)).

With regard to Pugh, certain factors in particular — promoting respect for the law, deterring criminal conduct, and protecting the public from further crimes of the defendant — should be afforded great weight. When these factors are considered along with the other § 3553(a) factors, a sentence within the guideline range of 12–18 months is appropriate.

A. **Evaluating § 3553(a)(2)(A) — "The Need for the Sentence Imposed to Reflect the Seriousness of the Offense, to Promote Respect for the Law, and to Provide Just Punishment for the Offense."**

The first factor this Court must consider is § 3553(a)(2)(A), which is the "just deserts" concept that addresses the needs for (1) retribution, (2) to make the punishment fit the crime, and (2) to not just punish, but to punish justly." *United States v. Irey*, 612 F.3d 1160, 1206 (11th Cir. 2010) (*en banc*). As the Eleventh Circuit has explained:

> This purpose—essentially the "just deserts" concept—should be reflected clearly in all sentences; it is another way of saying that the sentence should reflect the gravity of the defendant's conduct. From the public's standpoint, the sentence should be of a type and length that will adequately reflect, among other things, the harm done or threatened by the offense, and the public interest in preventing a recurrence of the offense. From the defendant's standpoint the sentence should not be unreasonably harsh under all the circumstances of the case and should not differ substantially from the sentence given to another similarly situated defendant convicted of a similar offense under similar circumstances.

*United States v. Pugh*, 515 F.3d 1179, 1195 (11th Cir. 2008) (citing S.Rep. No. 98–225, at 75–76, 1984 U.S.C.C.A.N. at 3258–59).

### (1) Evaluating the "Seriousness of Offense" Factor

The *actus reus* in this case — *i.e.,* smashing a window of a police vehicle — cannot be viewed in vacuum. Pugh was not convicted of a property destruction crime, but rather obstruction, and there are multiple factors that remove her obstructive act from the realm of mere vandalism.

The first factor is Pugh's premeditation. As the jury heard in her recorded interview, Pugh admitted she brought the metal baseball bat from home to the protests in downtown Mobile. *See* Attachment A, pp. 15–16. She showed up that day looking for a fight, and when an opportunity presented itself, she took it. This was not a heat of passion offense. Pugh's actions were preplanned.

Second, Pugh's act cannot be divorced from the context in which it occurred — literally. The fact that her obstructive act occurred during a civil disorder was an element the jury found the United States proved beyond a reasonable doubt. As Pugh herself aptly explained in her post-arrest interview: "I escalated, personally, on my own and no one followed behind me which they were supposed to do." *See* Attachment A, p. 7. Again, this was not simple vandalism. Pugh intentionally escalated an already volatile and dangerous situation.

Finally, Pugh's *mens rea* was to obstruct law enforcement, and that should be considered as well. Pugh did not use the bat she brought from home to smash a police car window for vandalism purposes. She specifically did it with the intent to obstruct law enforcement who were trying to deal with an ongoing civil disorder. As Pugh explained in her interview, she smashed the window so that the police would focus on her and her group could get away. *See* Attachment A, pp. 7–8.

For these reasons, this is not a simple property case about a broken window. Rather, this is a case of premeditated obstruction in which Pugh purposefully sought to escalate an already dangerous and volatile situation. Accordingly, Pugh's offense should be viewed with greater seriousness than if it were simply an act of vandalism

### (2) Evaluating the "Promote Respect for the Law" Factor

Thousands of people showed up in downtown Mobile on May 30, 2020, to protest following the heinous and despicable murder of George Floyd. As the jury saw and heard during trial, many thousands marched around the city, held vigils in Cathedral Square, and some congregated at the on-ramp to I-10. These individuals exercised their constitutional rights. Pugh's actions went beyond that.

Of all the people protesting in downtown Mobile on May 30, 2020, only Pugh was charged with a federal crime, because she chose to knowingly and intentionally obstructed law enforcement. At no point has Pugh demonstrated any respect for the law. Not when she planned to bring her bat from home. Not when she ran out from the crowd on the on-ramp, smashed the police car window, and then fled. And not in her post-arrest interview in which she attempted to justify her actions.

However, in this case, Pugh has *further* demonstrated her lack of respect for the law by her actions after she was released on conditions following her conviction. Less than a month after her conviction — while on strict conditions of release — Pugh was arrested in downtown Mobile for public intoxication, disorderly conduct, resisting arrest, and possession of brass knuckles.

Following Pugh's post-conviction arrest, a revocation hearing was held in which the bodycam video was excluded as mere cumulative evidence. However, portions of that bodycam video are relevant here to demonstrate why a guidelines range sentence is necessary to promote respect for the law in this case. *See* Attachment B.[1]

During the revocation hearing Mobile Police Officer Michael Goodson testified that he was driving on Dauphin Street at 2:00 am when patrons and staff from the Saddle Up Saloon flagged him down to assist with an ongoing incident. When Officer Goodson got to the bar, he witnessed an extremely intoxicated Pugh rolling on the ground on her back. Officer Goodson testified that he

---

[1]   A DVD containing relevant portions of this bodycam footage will be hand delivered to the Clerk's Office.

10

repeatedly tried to get Pugh to leave the bar and tried to find her husband so she could be driven home. However, Pugh continued to be belligerent and swung at the officer. At this point, Pugh was detained in his police vehicle while Officer Goodson continued to look for her husband.

While detained in the police car, Pugh repeatedly screamed vulgar and racist remarks at Officer Goodson, who is also African American. During her tirade, Pugh told Officer Goodson that she was a felon and that she was the person on the video who smashed the window. She also repeatedly demanded to be brought to jail. When Officer Goodson asked Pugh why she was yelling, Pugh screamed, "F*** YOU N****! Because I'm angry!" She continued her tirade by saying that Officer Goodson chose his profession because he had no "empathy" and was a "psychopath".

Ultimately, Officer Goodson located Pugh's husband. However, while Officer Goodson was talking with him, Pugh repeatedly screamed profanities at her husband. Fearing Pugh may be assaultive to her husband if she was released, Officer Goodson made the decision to arrest her. After being told she was under arrest, Pugh screamed that Officer Goodson should get his "free donuts you piece of sh*t a** b**ch!" Again, Pugh screamed, "F*** YOU N*****!" and called the officer a "b**ch a** n*****!" Pugh also announced that she had brass knuckles in her pocket.

While being transported to Mobile Metro Jail, Pugh asked why the woman she got into an altercation with was not arrested. Officer Goodson explained that he did not see the other woman and that Pugh was the only individual involved that refused to leave the bar's premises. Pugh, referencing the other woman, said "I'd rather f***ing kill that b**ch tonight!" When Officer Goodson asked why she would say something like that, Pugh said "At least I would get justice for the sh*t she said to me[!]" Pugh further explained her belief that "[t]he justice system is f***ing broken and I've got to be the brunt of it." Thereafter, Pugh continued her racist remarks by telling Officer Goodson that he had "tap shoes on." Upon arrival at Mobile Metro Jail, Pugh discarded her brass knuckles on the ground and was booked into state custody.

11

Pugh's post-conviction actions are both alarming and further evidence of her complete lack of respect for the law. Not only was Pugh extremely intoxicated at 2:00 am in violation of her curfew condition, but she was also — once again —armed with a dangerous weapon in downtown Mobile. This incident further highlights Pugh's well-documented lack of respect for the law. Pugh chose to disregard the conditions of release set by this Court, and when confronted by law enforcement, Pugh was belligerent, disorderly, and unwilling to abide by Officer Goodson's commands.

A straight probation sentence would mean Pugh would be on supervisory conditions set by this Court. Pugh chose to ignore the Court's orders following her conviction, and there is nothing to suggest that she will suddenly respect the law if placed on conditions again. Accordingly, a sentence within the advisory guidelines range is needed to promote respect for the law in this case.

### (3) Evaluating the "Just Punishment" Factor

What constitutes a "just punishment" for this offense depends largely on how this case is framed. On one hand, Pugh destroyed a police car window and the damage done was less than $600.00. On the other hand, the window was destroyed with a dangerous weapon Pugh brought from home, and was done with the intent to obstruct the law enforcement officers who were in the midst of dealing with an already volatile civil disorder.

Considering the nature of her offense, Pugh's lack of acceptance of responsibility, and especially her subsequent criminal acts while on conditions of post-conviction release, there is not a good basis for varying downward from the advisory guidelines range in this case. While Pugh lacked criminal history at the time she committed the obstruction offense, this should not be a basis for a variance since here criminal history is already taken into account when calculating the guidelines range. For these reasons, a "just sentence" for this offense is one within the properly calculated advisory guidelines range.

>    B.   Evaluating § 3553(a)(2)(B) and (C) — "The Need for the Sentence Imposed to Afford Adequate Deterrence to Criminal Conduct, and to Protect the Public from Further Crimes of the Defendant."

Section 3553(a)(2)(B) discusses the need for the sentence imposed to provide adequate deterrence to future criminal conduct.

With regard to specific deterrence, Pugh demonstrated that conditions of release are insufficient to keep her from engaging in additional criminal activity. Through her post-conviction actions, Pugh has shown why a period of incarceration is needed to deter her from future criminal conduct.

Evaluating the sentence in terms of general deterrence also cuts in favor of a custodial sentence. This case has garnered significant media attention both locally and nationally as Pugh was the first defendant charged under 18 U.S.C. § 231(a)(3) in relation to events during the summer of 2020 to take her case to trial. Varying downward to a probationary sentence in this case would likely have little to no value in deterring others from committing similar obstructive offenses during civil disorders in the future.

Similarly, § 3553(a)(2)(C) specifically addresses the need for the sentence to protect the public against the defendant committing future crimes. For all the reasons already set out in this sentencing brief, Pugh has demonstrated that a sentence consisting of only release conditions is likely to be an inadequate protection for the public.

Thus, the need for Pugh's sentence to have a deterrent effect and to protect the public from future criminal conduct by Pugh favors a sentence within the advisory guidelines range.

## CONCLUSION

For all the reasons stated herein, the United States recommends this Court sentence defendant Tia Pugh to a term of imprisonment between 12 and 18 months.

Respectfully submitted this 18th day of August 2021.

SEAN P. COSTELLO
UNITED STATES ATTORNEY
by:

By: /s/*Christopher J. Bodnar*  By: /s/*Justin D. Kopf*
Christopher J. Bodnar  Justin D. Kopf
Assistant United States Attorney  Assistant United States Attorney
63 South Royal Street, Suite 600  63 South Royal Street, Suite 600
Mobile, Alabama 36602  Mobile, Alabama  36602
(251) 441–5845  (251) 441-5845